## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS
## KANSAS CITY DIVISION

**JAMES ROCKY ALLEN,**

*Plaintiff,*

v.                                                        No.

**THE BOARD OF COUNTY
COMMISSIONERS OF
LINN COUNTY**, KANSAS;
**KEVIN FRIEND**, in his individual and
Official capacity;
**BOBBY JOHNSON**;
**BRYCE HART**;
**TOMMY MOORE**;
**KYLER PARSCALE**;
**TANNER OGDEN**;
**UNKNOWN OFFICERS OF THE LINN
COUNTY SHERIFF'S DEPARTMENT**;
**ROBERT BEABOUT**;
**RONNIE BURK**;
**JARROD GILL**;
**STEVEN GILLESPIE**;
**WILLIAM SMITH**;
**JEFF STOKES**;
**CHRIS TURNER**;
**UNKNOWN OFFICERS OF THE KANSAS
BUREAU OF INVESTIGATION**;
**ZACHERY BACHERT**;
**MARK DRENNAN**;
**CRAIG PRESLEY**;
**JONATHAN RAINES**;
**CLAYTON TARPLEY**;
**ROBERT VOIGTS**;
**UNKNOWN OFFICERS OF THE KANSAS
HIGHWAY PATROL**;
**CYNTHIA JO RIEG**;
**NICOLE SOUTHALL**;
**UNKNOWN ASSISTANT ATTORNEYS**

Page 1 of 41

**GENERAL OF THE KANSAS ATTORNEY
GENERAL'S OFFICE**;
**ERIN CARNEY**;
**MIRANDA EDWARDS**;
**JOHN EDWARDS**;
**DONALD BANKS**, in his individual and
Official capacity,

*Defendants.*

---

## COMPLAINT

---

Plaintiff James Rocky Allen ("Rocky") brings this Complaint against the above-named defendants, and states as follows:

### INTRODUCTION

1.     Rocky Allen was driving the speed limit when his truck crashed into the back of a car. That car had been stopped in the middle of the road and Rocky had not seen it until it was too late. Without his seatbelt, Rocky's head bounced off the truck's windshield, splintering the glass and leaving a bloodstain. The off-center collision caused both cars to rotate. They hit each other again as their momentum carried them into a nearby field before they came to rest. Rocky knew the other driver was dead; he did not know the other driver was his mother.

2.     The police arrived. They knew all about Rocky and his family. It was a small town. It did not take long for them to begin swapping stories about his family's eccentricities, like his father's

suicide. They quickly began to suspect something more sinister than an accident. Without waiting for an accident reconstruction report, the officers on scene decided that Rocky must have intentionally crashed his truck into his mother's car—that he had killed her on purpose.

3.      Rocky was arrested at the hospital and charged with second-degree murder. The Kansas Highway Patrol ("KHP") scrambled to gather evidence sufficient to obtain an arrest warrant and bring formal charges. Procedures, accuracy, and lawful investigation techniques were thrown aside.

4.      When the KHP completed an accident-reconstruction report three months later, it aligned with the officers' anecdotal observations at the scene. The cars must have hit each other more than once, and the extent of the damage must have required significant speed. And those multiple impacts, at such speed, revealed Rocky's intent to commit murder.

5.      Except it wasn't true. As the KHP would later be forced to admit, its original conclusions were wrong. There were not multiple intentional impacts at excessive speeds—there was the original crash, and then a second impact at a much lower speed. In fact, the damage from the first crash had made it impossible for Rocky to steer his truck into a second collision.

6.    In the wake of the KHP's about-face, the State all but surrendered. It amended Rocky's murder charge to leaving the scene of an accident. Rocky had spent a year in the Bourbon County Jail. He spent another year on house arrest. Everyone in his community knew he was accused of killing his mother. The county coroner had certified her death as a homicide.

7.    Rocky now sues Defendants for the unconstitutional misconduct that caused his wrongful arrest, detention, and prosecution, and the harm he suffered as consequence.

## JURISDICTION & VENUE

8.    This action is brought under 42 U.S.C. § 1983 to redress the Defendants' deprivation under the color of law of Plaintiff's rights secured by the United States Constitution.

9.    This Court has jurisdiction of this action under 28 U.S.C. §§ 1331 and 1367.

10.    Venue is proper under 28 U.S.C. § 1391(b). On information and belief, all parties reside in the District of Kansas, and the events that gave rise to Plaintiff's claims occurred within this judicial district.

## PARTIES

11.    Plaintiff **James Rocky Allen** is a resident of Linn County, Kansas.

12.     Defendant **Board of County Commissioners of the County of Linn, Kansas** is a county of the State of Kansas.

13.     Defendants **Kevin Friend**, **Bobby Johnson**, **Bryce Hart**, **Tommy ("Chip") Moore**, **Kyler Parscale**, **Tanner Ogden**, and other unknown law enforcement officers worked as law enforcement officers in the Linn County Sheriff's Office at the time of the events giving rise to Plaintiff's claims.

14.     Defendant Bobby Johnson was the Undersheriff of Linn County, Kansas, at the time of the events giving rise to Plaintiff's claims. Johnson reported to Sheriff Friend of Linn County, Kansas. Johnson and Friend supervised Defendants Hart, Moore, Parscale, Ogden, and other unknown law enforcement officers of the Linn County Sheriff's Department.

15.     Defendants Friend and Johnson acted in supervisory capacities over the other Linn County Defendant Officers at all times relevant to this Complaint. The constitutional violations and resulting injuries complained of herein were proximately caused by a pattern and practice of misconduct within the Linn County Sheriff's Department, which occurred with the knowledge and consent of Defendants Friend and Johnson, who personally knew about, participated in, facilitated, approved, and/or condoned this pattern and practice of misconduct, or at

least recklessly caused the alleged deprivations by their actions or by their deliberately indifferent failure to act.

16.    Collectively, Defendants Friend, Johnson, Hart, Moore, Parscale, Ogden, and other unknown law enforcement officers employed by the Linn County Sheriff's Department, are referred to as the **"Linn County Defendant Officers."**

17.    Defendants **Robert Beabout**, **Ronnie Burk**, **Jarrod Gill**, **Steven Gillespie**, **William Smith**, **Jeff Stokes**, **Chris Turner**, and other unknown law enforcement officers worked as law enforcement officers for the Kansas Bureau of Investigation ("KBI") at the time of the events giving rise to Plaintiff's claims.

18.    Collectively, Defendants Beabout, Burk, Gill, Gillespie, Smith, Stokes, Turner, and other unknown law enforcement officers who worked as law enforcement officers for the KBI, are referred to as the **"KBI Defendant Officers."**

19.    Defendants **Zachery Bachert**, **Mark Drennan**, **Craig Presley**, **Jonathan Raines**, **Clayton Tarpley**, **Robert Voigts**, and other unknown law enforcement officers worked for the Kansas Highway Patrol ("KHP") at the time of events giving rise to Plaintiff's claims.

20.    Collectively, Defendants Bachert, Drennan, Presley, Raines, Tarpley, Voigts, and other unknown law enforcement officers who

worked as law enforcement officers for the KHP, are referred to as the **"KHP Defendant Officers."**

21.     The Linn County Defendant Officers, the KHP Defendant Officers, and the KBI Defendant Officers are referred to collectively as **"Defendant Officers."**

22.     Defendants **Cynthia Jo Rieg**, **Nicole Southall**, and other unknown assistant attorneys general of the Kansas Attorney General's Office worked as attorneys for the Kansas Attorney General's Office at the time of events giving rise to Plaintiff's claims.

23.     Collectively, Defendants Rieg, Southall and other unknown assistant attorneys general of the Kansas Attorney General's Office are referred to as the **"AG Defendant Attorneys."**

24.     Defendant **Erin Carney** was the forensic pathologist at Forensic Medical Center at the time of the events giving rise to Plaintiff's claims. Defendant Carney conducted the autopsy of Charlotte Grimes and authored the autopsy report.

25.     Defendants **Miranda Edwards** and **John Edwards** were employed as forensic technicians at Forensic Medical Center at the time of the events giving rise to Plaintiff's claims and assisted Defendant Carney in conducting the autopsy of Charlotte Grimes.

26.     Collectively, Defendants Carney, Miranda Edwards, and John Edwards are referred to as the **"Forensic Medical Defendants."**

27.     Defendant **Donald Banks** was the District Coroner at the time of the events giving rise to Plaintiff's claims. On information and belief, Defendant Banks selected the medical examiner to conduct the autopsy of Charlotte Grimes.

28.     Plaintiff sues each individual Defendant in their individual capacity unless otherwise noted.

29.     Each Defendant Officer sued in his individual capacity acted under the color of law and within the scope of his employment when engaging in the misconduct described herein.

## FACTS

30.     In December of 2020, Rocky lived at 17413 Keitel Road in Parker, Kansas with his girlfriend, Tabitha Stephens. Rocky grew up in Linn County with his three siblings and their parents.

### The Accident & Scene Investigation

31.     At 3:07 p.m. on December 15, 2020, police received a report of a two-vehicle accident off Keitel Road, a two-lane gravel road with barbed wire fence running parallel to it. Police, fire, and ambulance were dispatched to the scene.

32.     Two men, Darrell Dilley and Weston O'Dell, had been driving down Keitel Road when they noticed debris in the road and saw a Silverado truck and smaller car in a nearby field. They stopped to help. When they approached the cars, the truck was unoccupied but still running. Inside of the car, a woman laid unconscious.

33.     As O'Dell and Dilley attempted to call 911, they saw a truck leave the driveway of a home to the south. The truck stopped and the driver (Rocky) identified himself as the driver of the truck in the accident. When Rocky exited his truck, they noticed he was barefoot. After confirming that 911 had been called, Rocky drove the truck home then returned to the crash site wearing shoes.

34.     Emergency personnel arrived. They found the front of the truck against the passenger door of the car. The back of the car was damaged. The truck's windshield was broken in a spiderweb pattern, with blood splatter in the center.

35.     Deputy Parscale was the first law enforcement officer to arrive. Rocky had known Parscale for about two years. He told Parscale that he was okay but had hit his head hard on the windshield—things were fuzzy, he was confused, and he needed an ambulance.

36.     As law enforcement continued to arrive, Deputies Ogden and Parscale determined that the female driver was dead. After an initial

misidentification, the driver was correctly identified as Charlotte Grimes, Rocky's mother.

37.     Based on a damaged fence post and a plastic taillight cover found nearby, Ogden and Raines determined that Rocky hit the fence post while conducting a three-point turn. The turn, they surmised, indicated that Rocky passed the stopped car and turned around to be facing the same direction.

38.     Ogden was also familiar with Rocky. Bodycam footage shows Ogden informing other emergency personnel that Rocky's dad had shot himself in the stomach with a shotgun a couple of years prior. He can also be heard saying "Ol' Rocky Allen."

39.     Parscale later explained that he believed the physical evidence indicated that the collision was clearly an intentional act, not an accident. He believed the first impact caused the rear damage to the car. Then, Parscale continued, Allen drove into the field and struck the car a second time, on the passenger side. His mind was made up.

40.     When Raines arrived on scene, Ogden debriefed him. Ogden explained that Rocky said the car was sitting in the roadway. Ogden opined that Rocky's truck came over the hill and hit the back of the car.

41.     Upon learning that the victim was also the mother of a Deputy Sheriff, the KHP was requested to investigate. Evidence at the scene was collected and photographed by the KHP.

42.     At 3:33 p.m., Ogden switched his body camera off, a clear violation of Department policy.

43.     Rocky was taken to Overland Park Regional Medical Center ("OPRMC") by ambulance. Ambulance and hospital staff described his behavior as abnormal and erratic. His behavior fluctuated from calm and collected to thrashing out and uncooperative.

44.     Bachert met Rocky at OPRMC to collect his blood. Bachert later described Rocky as agitated and yelling about being in pain when he arrived. Rocky consented to a blood draw.

45.     Rocky's responses regarding substance use or alcohol varied answer by answer. At one point, he reported taking pills that morning but could not recall the name of them or what they were for.

46.     At 4:19 p.m., just one hour and three minutes after the 911 call, a call note was entered: "Poss homicide investigation."

47.     KBI assistance was requested after Linn County Attorney Brun determined that there was evidence of intent.

48.     KBI Agents Gill and Burk arrived on scene and were debriefed by Lieutenant Drennen and Technical Trooper Voigts. They

were told that Grimes was stopped facing South when Allen's truck struck her from behind, likely at highway speeds. Evidence indicated that the truck did a three-point turn at a "faster than normal pace" and hit a fence post, just North of the crash. The truck hit the passenger side of the Nissan, near where both vehicles were located, about 50 yards into the pasture.

49.     Smith, the KBI Special Agent in-charge, called Beabout to inform him that after initial examination, KHP concluded that Rocky and Grimes were southbound on Keitel when he accelerated to hit the back of Grimes. Grimes went off the east side of the road and through a fence. Rocky then intentionally drove into the field to hit Grimes again.

50.     Beabout's report reflects that based on damage, KHP estimated that Rocky's truck was traveling at highway speeds when it first impacted the rear of the Nissan. Beabout agreed with KHP's conclusion that the second contact was intentional.

51.     The inaccurate conclusions concocted by KHP Defendant Officers and KBI Defendant Officers at the scene misled Linn County Attorney Brun, who relied on their conclusions in deciding to pursue charges against Rocky.

52.     That evening, Beabout interviewed O'Dell and Dilley. O'Dell reported that Rocky stated he hit his head on the windshield. Dilley and

O'Dell both told Beabout that Rocky stated he did not see the car prior to hitting it.

***Rocky is wrongfully arrested and charged***

53.     Defendant Beabout directed Defendants Stokes and Gillespie to place Rocky under arrest while at OPRMC.

54.     Rocky's bizarre and erratic behavior continued. During a CT, he became agitated and removed his IV. Hospital security was called. He tried to walk out of the hospital room. He denied pains that previously caused him to scream out. His statements were disoriented and nonsensical. For example, "Christmas is coming early this year," and "Space shuttle shit going on, on the news." He asked why he was in the hospital and continued to ask whether the other driver was okay.

55.     Defendants Stokes and Gillespie transported Rocky to Bourbon County Jail. His disoriented comments and behavior continued.

56.     Defendants Beabout and Stokes attempted to interview Rocky at approximately midnight, despite his involvement in a traumatic car accident and obvious signs of head trauma. He yelled incoherent statements and expressed delusional beliefs. Beabout and Stokes failed to intervene or end the interview until Rocky said that his heart and ribs hurt and asked to see a doctor.

57.     With Rocky in custody, and no evidence to establish probable cause, defendant officers knew that they had work to do. Inexplicably and despite no evidence to support Rocky's guilt, Defendants conspired to frame Rocky for his mother's murder.

58.     On December 16, 2020, Defendant Burk applied for and received a search warrant for Rocky's home. The warrant application made false and misleading assertions that had no evidentiary support.

59.     Defendants Burk, Stokes, Beabout, and Gill entered Rocky's home and executed the search warrant but seized only "digital photographs" after finding no prescription medications by the sink as Rocky had said they would. Notably, Defendants photographed a bill from Larned State Hospital. The shattered windows, lack of medications as described, and Larned Hospital bill would have led a reasonable officer to investigate Rocky's mental health. But not the defendants.

60.     Forensic Pathologist Dr. Erin Carney, assisted by John Edwards and Miranda Edwards, conducted Grimes' autopsy on December 17, 2020, at Forensic Medical of Kansas. Defendant Beabout and Linn County Attorney Brun attended. Dr. Carney issued a preliminary finding that the cause of death was homicide by multiple blunt force injuries.

61.    On December 17, 2020, Defendant Burk applied for and received more search warrants – for Rocky's truck and DNA. Again, the applications included false and misleading assertions, and omitted material information that a reasonable officer would know that a judge would want to know. Neither application made any mention of the search of Rocky's home failing to turn up the purported prescriptions that Rocky had taken prior to the crash. Instead, they stated that Rocky had intentionally struck his mother's car at least three times before her car rolled.

62.    Defendant Burk entered and searched Rocky's truck on December 17, 2020.

63.    On December 18, 2020, Defendants Gill and Beabout obtained Rocky's DNA by collecting buccal swabs.

64.    Defendant Beabout executed the Probable Cause Affidavit on December 18, 2020, setting forth that Rocky "intentionally caused the death of Charlotte Grimes by striking her vehicle, with her in it, multiple times at high rates of speed." Defendant Beabout swore to false information and misleading statements, which was later published by the local media.

65.    Rocky was charged with second-degree murder based on the Defendants' misconduct.

*Subsequent investigation & the reconstruction report*

66.    Aware of the weakness of their case, Defendant Officers either deliberately failed to investigate or deliberately ignored evidence of Rocky's innocence and withheld exculpatory information, the full extent of which is presently unknown to Plaintiff.

67.    On December 22, 2020, Defendant Beabout applied for and received a search warrant for a forensic examination of Rocky's phone. The next day, Defendant Turner conducted the search and Defendant Beabout seized the extracted data.

68.    Defendant Officers continued to hear from witnesses who uniformly contradicted their theory of intent. They heard repeatedly about the good relationship between Rocky and his mother. No one knew of any issues between the two.

69.    Witnesses repeatedly told Defendant Officers that Rocky likely wouldn't have recognized the car his mother was driving, that there was no conceivable motive, and that Rocky would not have been drinking or using drugs on the day of the accident. But Defendants persisted, undeterred by the evidence.

70.    The KBI lab concluded that there was no alcohol present in Rocky's bloodstream at the time of the crash. Hospital records could not confirm the presence of any substances or alcohol.

71. Despite providing preliminary conclusions at the scene, more than three months passed before the KHP provided the KBI an Accident Reconstruction Report.

72. Voigts authored the Accident Reconstruction Report, concluding that Rocky had driven south "at such a speed, that it caused a significant rear-end impact with Mrs. Grimes in her stationary Nissan." The Nissan went off the road to the east. The Chevrolet went off the road to the west, went back to the east and into the pasture. "Mr. Allen used his vehicle to strike the Nissan again, this time in the passenger's side doors..."

73. Rocky's defense team hired their own expert in reconstruction, Kris Keberlein, who examined the scene, vehicles, and data obtained from the Nissan. After reading the reconstruction report authored by defense expert Keberlein, Voigts asked other Technical Troopers for a second opinion. Voigts described his report as "just a forensic map narrative" before admitting that he was "not the foremost expert."

74. Voigts emailed Defendants Southall and Rieg after speaking with the Technical Troopers. They agreed with the defense expert – the second impact was not intentional. Voigts misread the data. Voigts pointed out that normally they try to verify the data but that wasn't

done for the second collision. He had also been unaware of Rocky's injuries.

75.     Rocky filed a Motion for Bond Reduction with Keberlein's Reconstruction/Investigation Report attached. The motion was heard, and Keberlein testified to the contents of his report, detailing why the KHP Accident Reconstruction Report was inaccurate and false.

76.     Rocky's bond was reduced from $1,000,000 to $250,000. He was released on bond after 332 days in custody. Rocky was placed on GPS tracking and house arrest.

77.     The presentation of Keberlein's expert report forced KHP to reconsider its Accident Reconstruction Report and conclusions.

78.     In May of 2022, Defendant Voigts issued an amended Accident Reconstruction Report. This report more than doubled in length and was substantially different than the first. The introduction admitted that "[t]he initial report was completed based on incomplete information and rendered opinions that were ultimately inaccurate…"

79.     At the end of the report was a disclaimer not previously included: "The opinions in this report are subject to change pending the discovery and/or development of additional evidence. As additional information is made available or as new facts are revealed during the investigation or discovery process, my professional opinions may change

to reflect any newfound information. The opinions expressed here, however, are current and accurately reflect my conclusions based on the information reviewed and the analysis performed as of this date."

80.     The conclusions of the Amended Report were substantially different than those of the initial report. Importantly, the Chevrolet struck the Nissan between 40-55 mph; Rocky likely hit his head on the windshield from the first impact; the Chevrolet struck the Nissan a second time at 9-33 mph; and the first contact caused the Chevrolet's front bumper to come into contact with the driver's side front wheel.

### *Rocky pleads to leaving the scene*

81.     Nearly two years after the tragic collision that resulted in his mother's death, Rocky's second-degree murder charge – a severity level one person felony - was amended to leaving the scene of an injury accident – a class A misdemeanor. Rocky entered a no contest plea and was sentenced to time served.

### *Rocky's injuries*

82.     Rocky's life was upended by the misconduct committed by the Defendants.

83.     In custody, Rocky continued to suffer from headaches and chest pain. Despite attempting to obtain treatment, he was unable to follow up with care as directed when discharged from the hospital.

84.     In addition to the severe trauma of Plaintiff's wrongful

detention and prosecution, Defendants' misconduct caused and

continues to cause extreme physical and psychological pain and

suffering, humiliation, persistent fear, anxiety, depression, despair,

rage, and other physical and psychological effects.

**COUNT ONE – 42 U.S.C. § 1983**
**Fabrication of Collision Evidence**
*Against Defendant Officers*

85.     Plaintiff reincorporates each paragraph of this Complaint as

if fully restated here.

86.     As described more fully above, Defendant Officers, while

acting individually, jointly, and in conspiracy with one another, as well

as under color of state law and within the scope of their employment,

deprived Plaintiff of his constitutional right to a fair trial by fabricating

evidence about the collision.

87.     In the manner more fully described above, Defendant

Officers fabricated evidence that Plaintiff intentionally collided with his

mother's car multiple times.

88.     The Defendant Officers' misconduct resulted directly in the

unjust prosecution of Plaintiff, thereby denying his constitutional right

to a fair trial guaranteed by the Fourteenth Amendment and his right to

be free from unreasonable seizures guaranteed by the Fourth

Amendment. Absent this misconduct, the detention and prosecution of Plaintiff could not and would not have been pursued.

89.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth of Plaintiff's clear innocence.

90.     As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

91.     The misconduct described in this Count by the Linn County Defendant Officers was undertaken pursuant to the policy and practice of Linn County, Kansas, in the manner more fully described below, in Count Ten.

### COUNT TWO – 42 U.S.C. § 1983
### Deprivation of Liberty without Due Process of Law by Wrongfully Arresting and Detaining Plaintiff Pre-Trial
*Against Defendants Beabout, Stokes, Gillespie*

92.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

93.     Defendants, acting individually and in concert, and within the scope of their employment and under color of state law, deprived

Plaintiff of his clearly established constitutional rights to due process of law and to be free of unreasonable seizures, and rights guaranteed by K.S.A. § 22-2401.

94.    Defendants unlawfully detained Plaintiff in violation of the Fourth and Fourteenth Amendments by arresting him on December 15, 2020, without a warrant and without probable cause.

95.    After arresting Plaintiff without probable cause, Defendants caused Plaintiff's continued detention without a probable cause determination and allowed undue delay before bringing Plaintiff before a magistrate judge.

96.    When Defendant Beabout finally did obtain an arrest warrant on December 18, 2020, he submitted the warrant application in deliberate falsity or reckless disregard for the truth and knowingly or recklessly omitted material facts, including the following:

    a.   Allen removed medical equipment and wanted to leave the
         hospital. As stated, the application misled the judge to
         believe that Allen tried to escape from police custody.

    b.   The affidavit states that Allen's first interview was
         terminated because of his bizarre behavior, but the
         interview was terminated because he asked for medical

attention after a slew of incoherent statements and
concerning behavior indicative of head trauma.

    c.  The "multiple times at high rates of speed" narrative and
Allen's ability to steer his truck after the initial collision
were disproven by both Keberlein's report and the KHP's
amended report. These conclusions were made three months
before receiving a written report from CHART.

97.    The arrest warrant lacked probable cause because the
information relied upon was false and misleading, and rendered wholly
unreliable by material omissions.

98.    Defendants' actions were intentional, wanton, and malicious
and taken with reckless disregard for the truth. Defendants knew or
should have known that they lacked any probable cause whatsoever to
arrest or detain Plaintiff.

99.    Defendants' actions violated Plaintiff's right to be free from
unreasonable seizures and right to due process, thereby violating the
Fourth and Fourteenth Amendments of the United States Constitution.
Defendants' actions also violated rights guaranteed by the State of
Kansas through K.S.A. §§ 22-2401 and 22-2901 and the Kansas
Constitution Bill of Rights § 15.

100.   As a result of the misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuous injuries and damages, including the financial burden of retaining an attorney to defend against the wrongful charges and the stress and psychological impact of having to defend against wrongful charges from inside a jail cell.

### COUNT THREE – 42 U.S.C. § 1983
### Malicious Prosecution
*Against Defendant Officers and AG Defendant Attorneys*

101.   Plaintiff incorporates each paragraph of this complaint as if fully restated here.

102.   Defendants Officers and AG Defendant Attorneys deprived Plaintiff of substantive due process in violation of the Fourth and Fourteenth Amendments by maliciously prosecuting him without probable cause.

103.   In the manner described more fully above, Defendant Officers, and AG Defendant Attorneys individually, jointly, and in conspiracy with one another, as well as under color of state law and within the scope of their employment, deprived Plaintiff of his constitutional rights.

104.   Defendant Officers and AG Defendants accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so, in violation of his rights secured by the Fourth and Fourteenth Amendments of the United States Constitution.

105.   In doing so, Defendant Officers and AG Defendants caused Plaintiff to be unreasonably seized and improperly subjected to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury, and such proceedings ultimately terminated in Plaintiff's favor.

106.   The Defendant Officers and AG Defendants subjected Plaintiff to unauthorized and arbitrary governmental action that shocks the conscience in that Plaintiff was deliberately and intentionally framed for a crime through Defendant Officers' and AG Defendants' fabrication, suppression, and withholding of evidence.

107.   The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

108.   Plaintiff lacks an adequate state law remedy to redress Defendants' misconduct described in this Count.

109.   As a result of the misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuous injuries and damages, including the financial burden of retaining an attorney to defend against the wrongful charges.

### COUNT FOUR – 42 U.S.C. § 1983
### Failure to Intervene
*Against Defendant Officers and AG Defendant Attorneys*

110.   Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

111.   By their conduct and under color of state law, Defendant Officers and AG Defendant Attorneys, acting within the scope of their employment, had reasonable opportunities to intervene on behalf of Plaintiff to prevent his malicious prosecution and deprivation of liberty without due process of law, but with deliberate indifference, declined to do so.

112.   Defendants' failures to intervene violated Plaintiff's clearly established constitutional right not to be deprived of liberty without due process of law as guaranteed by the Fourth and Fourteenth Amendments. The misconduct described in this Count was objectively unreasonable and the duty to intervene would have been obvious to any objectively reasonable law enforcement officer.

113.   Defendants' acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Plaintiff's injuries. Defendants knew, or should have known, that their conduct would result in Plaintiff's wrongful arrest and prosecution.

114.   The misconduct described in this Count by the Linn County Defendant Officers was undertaken pursuant to the policy and practice of Linn County, Kansas, in the manner more fully described in Count Ten.

### COUNT FIVE – 42 U.S.C. § 1983
### Civil Rights Conspiracy
*Against Defendant Officers and AG Defendant Attorneys*

115.   Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

116.   After Grimes' tragic death, Defendant Officers and AG Defendant Attorneys, acting within the scope of their employment and under color of state law, agreed among themselves and with others to act in concert to deprive Plaintiff of his clearly established Fourth, Fifth, and Fourteenth Amendment rights.

117.   In so doing, these co-conspirators conspired, and had a meeting of the minds, to accomplish an unlawful purpose by an unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of these rights.

118.   In furtherance of their conspiracy, each defendant engaged in and facilitated overt acts and were otherwise willful participants in joint activity, including, without limitation, the acts stated herein.

119.   The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

120.   As a direct and proximate result of Defendants' actions, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

## COUNT SIX - 42 U.S.C. § 1983
### Conducting a Search of Plaintiff's Home in the Absence of Probable Cause
*Against Defendants Stokes, Beabout, Gill, Burk*

121.   Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

122.   The Fourth Amendment protects Americans from unreasonable searches and seizures, with the highest level of protection afforded to the home.

123.   Acting under color of state law, Defendants Stokes, Beabout, Gill, and Burk entered the home of Plaintiff and Tabitha Stephens in the absence of probable cause to search the home.

124.   Although Defendants had a warrant signed by a Linn County District Court judge, the warrant lacked probable cause because the information relied upon was false and misleading, and rendered wholly unreliable by material omissions.

125.   Defendant Burk submitted the warrant application in deliberate falsity or reckless disregard for the truth and knowingly or recklessly omitted material facts, including the following:

    a.   Defendant Burk swore that "…the truck driven by Allen intentionally struck the Versa, driven by Grimes, at least three consecutive times before both vehicles came to rest…" despite having no evidence of three impacts.

    b.   Defendant Burk omitted that Plaintiff's interview was terminated because he asked for medical attention after a slew of incoherent statements and erratic behavior. Defendant KBI Agents interviewed Plaintiff just after midnight after he had been in a fatal car accident and hit his head on the windshield. Plaintiff didn't know what day it was or remember being in a car accident and stated that the

day before, he thought China put a chip in him and had

control over him. None of which was disclosed to the judge.

c.   The affidavit did not disclose that Plaintiff's girlfriend had

already contradicted Plaintiff's inconsistent statements

about substance and alcohol use when she told Defendants

Beabout and Gill that Plaintiff hadn't drank in two weeks

and wouldn't have taken any drugs or medications. Or that

Plaintiff likely wouldn't have recognized the other car or

known his mother was the driver.

126.   Defendants' actions were intentional, wanton, and malicious

and taken with reckless disregard for the truth. Defendants knew or

should have known that they lacked any probable cause whatsoever to

enter and search Plaintiff's home.

127.   Defendants' actions violated Plaintiff's right to be secure in

his own home and to be free from unreasonable searches and seizures,

thereby violating the Fourth Amendment of the United States

Constitution. Defendants' actions also violated Plaintiff's right to

substantive due process under the Fourteenth Amendment.

128.   Defendants' actions proximately and directly caused

Plaintiff to suffer grievous and continuing injuries, including

humiliation, embarrassment, and emotional distress.

**COUNT SEVEN - 42 U.S.C. § 1983**
**Conducting a Search of Plaintiff's Truck in the Absence of**
**Probable Cause**
*Against Defendant Burk*

129.   Plaintiff incorporates each paragraph of the Complaint as if fully restated here.

130.   Defendant Burk submitted the warrant application in deliberate falsity or with reckless disregard for the truth and knowingly or recklessly omitted material facts, including the following:

    a. The affidavit stated, "Interviews of initial witnesses revealed that Allen was seen walking away from the crash scene," misrepresenting that Allen fled, when he in fact returned to the scene and told witnesses that he was the other driver.

    b. The affidavit presented the potential of locating Plaintiff's cellular device as part of the need for the warrant. Defendant Burk failed to disclose that Plaintiff's phone was already in property and had been taken from Plaintiff when he was taken into custody.

    c. The affidavit makes no mention of the failed search of Plaintiff's home to locate medications he supposedly ingested by the kitchen sink. Instead, it claims that Plaintiff made admissions to consuming marijuana on the day of the

accident, omitting his numerous denials of drug or substance use.

131.   Acting under color of state law, Defendant Burk entered and searched Plaintiff's truck without probable cause.

132.   Defendant's actions were intentional, wanton, and malicious and taken with reckless disregard for the truth. Defendant Burk knew or should have known that he lacked any probable cause whatsoever to enter and search Plaintiff's truck.

133.   Defendant's actions violated Plaintiff's right to be free from unreasonable searches and seizures, thereby violating the Fourth Amendment of the United States Constitution. Defendant's actions also violated Plaintiff's right to substantive due process under the Fourteenth Amendment.

134.   Defendant Burk's actions proximately and directly caused Plaintiff to suffer grievous and continuing injuries, including humiliation, embarrassment, and emotional distress.

### COUNT EIGHT – 42 U.S.C. § 1983
### Conducting a Search of Plaintiff and Obtaining His DNA in the Absence of Probable Cause
*Against Defendants Burk, Gill, and Beabout*

135.   Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

136.   Defendant Burk knowingly and intentionally supplied false and misleading information and omitted material facts to secure a warrant to obtain Plaintiff's DNA, including the following:

   a.   The affidavit represented that DNA was needed to prove that Allen was the driver, but Defendants were confident enough in that fact that they had already arrested Allen for second degree murder.

   b.   The affidavit misrepresented that Plaintiff fled, stating, "Interviews of initial witnesses revealed that Allen was seen walking away from the crash scene," when really, he returned to the scene and told every witness, law enforcement officer, and medical professional he encountered that he was the other driver.

137.   Defendant Burk's false, misleading statements and material omissions caused an illegal search of Plaintiff to obtain DNA samples against his will.

138.   Acting under color of state law, Defendants Gill and Beabout collected Plaintiff's DNA without probable cause.

139.   Defendants' actions were intentional, wanton, and malicious and taken with reckless disregard for the truth. Defendants knew or

should have known that they lacked any probable cause to obtain Plaintiff's DNA.

140.   Defendants' actions caused Plaintiff to be subject to a compelled DNA test based upon a fraudulently obtained warrant, which violated Plaintiff's Fourth Amendment right to be free from unreasonable searches and seizures. Defendants' actions also violated Plaintiff's right to substantive due process under the Fourteenth Amendment.

141.   Defendants' actions proximately and directly caused Plaintiff to suffer grievous and continuing injuries, including humiliation, embarrassment, and emotional distress.

## COUNT NINE - 42 U.S.C. § 1983
### Seizing and Conducting a Search of Plaintiff's Phone in the Absence of Probable Cause
*Against Defendants Beabout and Turner*

142.   Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

143.   Defendant Beabout knowingly and intentionally supplied false and misleading information and omitted material information, including the following:

    a. Defendant Beabout omitted that he had already interviewed the attorney Grimes was scheduled to meet with. The

attorney stated that he was going to meet with Grimes to discuss estate planning but that he was not her attorney and had never met her before, eliminating the supposed motive.

b.  Defendant Beabout heard from another witness, Grimes' son-in-law, that he did not know of any changes to the will that would have impacted Allen and that the relationship between Allen and Grimes was good. His report that Allen was not known to use drugs and had been sober for three weeks was similarly not included.

c.  Again, the failed search of Plaintiff's home is not mentioned but his admission to consuming prescription medication is.

144.   Defendant Beabout's false, misleading statements and material omissions caused an illegal search of Plaintiff's phone, in the absence of probable cause.

145.   Acting under color of state law, Defendants Beabout and Turner conducted a forensic examination of Plaintiff's phone and collected the data, all without probable cause.

146.   Defendants' actions were intentional, wanton, and malicious and taken with reckless disregard for the truth. Defendants knew or should have known that they lacked probable cause to conduct a search of Plaintiff's phone.

147.   Defendants' actions violated Plaintiff's right to be free from unreasonable searches and seizures. Defendants' actions also violated Plaintiff's right to substantive due process under the Fourteenth Amendment.

148.   Defendants' actions proximately and directly caused Plaintiff to suffer grievous and continuing injuries, including humiliation, embarrassment, and emotional distress.

### COUNT TEN – 42 U.S.C. § 1983
### Municipal Liability
*Against Defendant Board of County Commissioners and Defendant Friend in his official capacity*

149.   Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

150.   As described more fully herein, Defendant Board of County Commissioners for the County of Linn, Kansas, and Defendant Friend in his official capacity as Sheriff of Linn County, are themselves liable for the violations of Plaintiff's constitutional rights.

151.   Plaintiff's injuries were caused by the policies, practices, and customs of the Linn County Sheriff's Department, in that employees and agents of the Linn County Sheriff's Department regularly failed to disclose exculpatory evidence to criminal defendants, fabricated false evidence implicating criminal defendants in criminal conduct, pursued

wrongful convictions through profoundly flawed investigations, and otherwise violated due process in a similar manner to that alleged herein.

152.   The above-described widespread practices, which were so well-settled as to constitute de facto policy of the Linn County Sheriff's Department, were allowed to exist because municipal policymakers with authority over the same exhibited indifference to the problem, effectively ratifying it. Further, the above-described widespread practices were allowed to flourish because the Linn County Sheriff's Department declined to implement sufficient training or any legitimate mechanism for oversight or punishment of officers or agents who withheld material evidence, fabricated false evidence, and pursued wrongful convictions.

153.   The constitutional violations described in this Complaint were also undertaken pursuant to the policy and practices of the Linn County Sheriff's Department in that the constitutional violations were committed with the knowledge or approval of persons with final policymaking authority for Linn County and the Linn County Sheriff's Department or were actually committed by persons with such final policymaking authority.

154.    Specifically, Linn County's final policymakers with respect to functions of the Linn County Sheriff's Department, were Sheriff Kevin Friend and/or Undersheriff Bobby Johnson.

155.    Defendants Friend and Johnson ratified and authorized the fabrication of evidence and the withholding of exculpatory information.

156.    The ratification and authorization of this misconduct by Defendants Friend and Johnson constituted the official policy of Linn County and Sheriff Friend and Defendant Johnson were deliberately indifferent to the risk that these policies, practices, and customs would lead to the violation of citizens' constitutional rights.

157.    The policies, practices, and customs set forth above were the moving force behind numerous constitutional violations in this case and directly and proximately caused Plaintiff to suffer the grievous and permanent injuries and damages set forth herein.

**COUNT ELEVEN – Kansas State Law**
**Defamation**
*Against Defendants Donald Banks and Forensic Medical Defendants*

158.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

159.    On December 22, 2020, Defendants caused to be printed, published, and shared preliminary findings of the autopsy of Charlotte Grimes which falsely and maliciously stated the type of death as

"Suspected Homicide" and the preliminary manner of death as

"Homicide." The case summary stated that the case was "being

investigated as a homicide as the son is suspected of hitting decedent in

her car near his home."

160.   On February 24, 2021, Defendants published and shared the

final autopsy report, which also included false statements, including

that Charlotte Grimes' manner of death was "homicide."

161.   By the publication of the above-mentioned statements,

Defendants charged that Plaintiff intentionally caused Grimes' death.

Grimes' death was the result of an unintentional motor vehicle accident,

not a homicide.

162.   The statements were false and shared with third parties

maliciously or with wanton disregard for the truth of the statements. In

making such assertions, Defendants intended to and did refer to

Plaintiff, as was understood by various other persons who read the

publication.

163.   Defendants' actions directly and proximately caused harm to

Plaintiff. Plaintiff's reputation was damaged - he was exposed to public

contempt and ridicule and was deprived of the benefits of public

confidence and social acceptance. The charges assert that Plaintiff

intentionally killed his own mother, causing plaintiff to be shunned,

avoided, and feared as he was imputed to a cruel, violent, heartless character. The assertions injured and continue to injure Plaintiff by causing severe mental and emotional anguish, anxiety, humiliation, shame, and fear. The false statements further damaged Plaintiff's ability to defend himself against wrongful and false charges.

## CLAIM FOR DAMAGES

164.   The actions of Defendants violated Plaintiff's civil rights under the Fourth and Fourteenth Amendments of the United States Constitution and violated the laws of the State of Kansas.

165.   The intentional, malicious, and/or reckless actions or omissions of Defendants caused Plaintiff to suffer severe and ongoing humiliation, shame, embarrassment, and emotional distress.

166.   The Defendants' actions were deliberate, wanton, malicious and/or cruel, thus justifying an award of punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff James Rocky Allen respectfully requests that this Court enter a judgment in his favor and against Defendants, awarding compensatory damages, attorneys' fees and costs against each Defendant, punitive damages against each of the individual Defendants, interest, and any other relief this Court deems just and appropriate.

## JURY DEMAND

Pursuant to D. Kan. Rule 40.2, Plaintiff requests Kansas City, Kansas as the place of trial. Plaintiff James Rocky Allen hereby demands a trial by jury pursuant to Federal Rule of Procedure 38(b) on all issues so triable.

Dated: October 5, 2023

Respectfully submitted,

**MORGAN PILATE LLC**

<u>/s/ Branden A. Bell</u>
Branden A. Bell, KS #22618
926 Cherry Street
Kansas City, Missouri 64106
p 816.471.6694
e bbell@morganpilate.com
*Attorney for Mr. Allen*