## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

JAMES ROCKY ALLEN,

   Plaintiff,

   v.         Case No. 2:23-cv-02453-HLT-BGS

LINN COUNTY, KANSAS, BOARD OF
COMMISSIONERS, et al.,

   Defendants.

## MEMORANDUM AND ORDER

Plaintiff James Rocky Allen was involved in a tragic car accident. His truck hit the back of a car, and both vehicles left the road and came to a stop in a field, with the truck against the passenger side of the car. Plaintiff twice left the scene and returned while passersby stopped to help and call authorities. The driver of the other vehicle died at the scene. The other driver also happened to be Plaintiff's mother.

Officers from three law enforcement agencies were called to investigate the accident. The initial conclusion by law enforcement was that the collision had been intentional, which led to Plaintiff being charged with his mother's murder. But a subsequent accident reconstruction report concluded that the accident was just that—an accident. Prosecutors dropped the murder charge. By that time, however, Plaintiff had spent several months in custody and under house arrest.

Plaintiff now sues what appears to be every officer involved in the investigation, along with two prosecutors, and the county where the accident occurred. He alleges ten constitutional violations against twenty Defendants. Defendants move to dismiss half the claims. Doc. 53; Doc. 55; Doc. 57. These claims include 42 U.S.C. § 1983 claims for fabrication of evidence, malicious prosecution, failure to intervene, conspiracy, and municipal liability. These claims all stem from

Plaintiff's contention that the intentional-crash theory was maliciously fabricated to justify his prosecution.

Resolving these motions has been difficult, in part because the broad and often collective allegations by Plaintiff, and in part because of the approach taken by some Defendants in the motions. After carefully reviewing the motions and associated briefing, the Court finds that Counts One, Three, Four, Five, and Ten must be dismissed, and with them, most Defendants. The Court will list the rulings in the conclusion. Highly summarized, these claims must be dismissed because they are all premised on the allegation that Defendants knowingly fabricated evidence, but there are no facts that support this allegation. Without plausible factual allegations, these claims all fail.

I.      **BACKGROUND**

    A.      **The Parties**

Plaintiff brings this case under 42 U.S.C. § 1983. Doc. 47 at ¶ 8. Plaintiff grew up and resides in Linn County, Kansas. *Id.* ¶¶ 11, 26. Most Defendants are sued in their individual capacity, except Kevin Friend and Bobby Johnson,[1] who are sued in both their individual and official capacities. Although the Court often refers to "Defendants" collectively, there are several subgroups.

Defendants Friend, Johnson, Kyler Parscale, and Tanner Ogden work for the Linn County Sheriff's Office. *Id.* ¶ 13. Friend was the sheriff, and Johnson was the undersheriff, and together they supervised Parscale and Ogden. *Id.* ¶ 14. Along with the Linn County Board of Commissioners, *id.* ¶ 12, they are the "Linn County Defendants."

---

[1]   The amended complaint doesn't clearly indicate that Johnson is sued in his official capacity, but the parties proceed as if he is.

Defendants Cynthia Jo Rieg and Nicole Southall work as attorneys for the Kansas Attorney General ("AG"). *Id.* ¶ 22. Defendants Robert Beabout, Ronnie Burk, Jarrod Gill, Steven Gillespie, William Smith, Jeff Stokes, and Chris Turner work for the Kansas Bureau of Investigation ("KBI"). *Id.* ¶ 17. These parties are referred to separately as the "AG Defendants" and "KBI Defendants," or collectively as the "AG/KBI Defendants."

Defendants Zachery Bachert, Mark Drennan, Craig Presley, Jonathan Raines, Clayton Tarpley, and Robert Voigts work for the Kansas Highway Patrol ("KHP"). *Id.* ¶ 19. They are referred to as the "KHP Defendants."

**B.     The Accident**

On December 15, 2020, at 3:07 p.m., police received reports of a two-vehicle accident near Keitel Road. *Id.* ¶ 27. Keitel Road is a two-lane gravel road with a barbed wire fence on the side. *Id.* The accident was reported by two men who came upon the scene. *Id.* ¶ 28. They saw a Silverado truck and smaller car in a field and stopped to help. *Id.* The truck was unoccupied, but there was an unconscious woman in the car. *Id.*

As the two men were calling 911, they saw a truck leave a nearby home. *Id.* ¶ 29. Plaintiff was the driver of the truck, and he told the men he had been driving the Silverado. *Id.* Plaintiff was barefoot. *Id.* As the men called 911, Plaintiff drove home and walked back wearing shoes. *Id.*[2]

When emergency personnel arrived, they found the front of the truck against the passenger door of the car. *Id.* ¶ 30. The back of the car was also damaged. *Id.* The truck's windshield was broken in a spiderweb pattern and had blood splatter on it. *Id.*

---

[2]     The amended complaint states that a Silverado truck was involved in the accident and was found unoccupied by the two men who came upon the scene. It then states Plaintiff arrived back at the scene in a "truck," before driving the Silverado home and walking back. Doc. 47 at ¶¶ 28-30. But when emergency personnel arrived, they examined the truck that had been involved in the accident—the Silverado. *Id.* ¶ 30. Although the amended complaint states that Plaintiff drove the Silverado home, *id.* ¶ 29, that is presumably a misstatement, and the truck Plaintiff drove home was the second truck he used to return to the scene. This discrepancy does not factor into the analysis.

Linn County Defendant Parscale arrived on scene first. *Id.* ¶ 31. Plaintiff reported he was okay, but that he had hit his head on the windshield, things were fuzzy and confused, and he needed an ambulance. *Id.* Linn County Defendants Parscale and Ogden determined that the driver of the car was dead. *Id.* ¶ 32. It was later determined that the woman driving the car was Plaintiff's mother, Charlotte Grimes. *Id.*

Ogden and Parscale were familiar with Plaintiff and knew of his family. *Id.* ¶¶ 31, 33. Parscale immediately believed Plaintiff had intentionally hit Grimes's car and told other officers as much. *Id.* ¶ 34. They also requested that KHP investigate.[3] *Id.* ¶ 35.

When KHP Defendant Raines arrived, Ogden reported what he and Parscale suspected. *Id.* ¶ 36. Plaintiff had reported that Grimes's car was sitting in the road when he crested a hill and collided with it. *Id.* At some point, Ogden switched his body camera off in violation of policy. *Id.* ¶ 37. Ogden and Raines also observed a damaged fence post near the accident scene and decided to tell people that Plaintiff had hit it while conducting a turn, and that this meant Plaintiff had passed the stopped car, turned around, and driven back to hit it. *Id.* ¶ 38.

Plaintiff was taken to the hospital, where his behavior was described as abnormal and erratic, and he fluctuated from being calm to agitated and uncooperative. *Id.* ¶¶ 39-40. At one point, Plaintiff reported taking pills that morning, but he could not remember what the pills were for. *Id.* ¶ 41. He also removed his IV during a CT scan, causing security to be called. *Id.* ¶ 50. He made nonsensical statements. *Id.* Plaintiff asked why he was in the hospital and if the other driver was okay. *Id.*

---

[3] The amended complaint indicates that the KHP was asked to investigate because the "victim was also the mother of a Deputy Sheriff." Doc. 47 at ¶ 35. There are no other facts addressing or clarifying this.

### C.      The Investigation

About an hour after the 911 call, the KBI and Linn County Sheriff officials determined the case was a possible homicide. *Id.* ¶ 42. KBI Defendants Gill and Burk arrived at the scene. *Id.* ¶ 44. KHP Defendants Drennan and Voigts told them what the others had said, namely that Grimes's car had been stopped in the road, and Plaintiff hit it from behind at highway speeds. *Id.* They also said that Plaintiff had made a three-point turn at a "faster than normal pace," hit a fence post, and then hit the passenger side of the car. *Id.*

KBI Defendant Smith called KBI Defendant Beabout to report the conclusion that Plaintiff's vehicle had struck Grimes's car twice. *Id.* ¶ 45. Beabout later wrote a report reflecting this theory and the conclusion that the crash was intentional. *Id.* ¶ 46. Plaintiff alleges that the "intentional-crash conclusion concocted by the Linn County Officers, the KHP Defendant Officers, and the KBI Defendant Officers misled" the Linn County Attorney into charging Plaintiff with murder. *Id.* ¶ 47.[4]

### D.      The Arrest

KBI Defendant Beabout directed KBI Defendants Stokes and Gillespie to arrest Plaintiff while he was in the hospital. *Id.* ¶ 49. They then drove Plaintiff to the Bourbon County Jail. *Id.* ¶ 51. Plaintiff's disoriented comments and erratic behavior continued. *Id.* Nevertheless, Beabout and Stokes tried to interview him about the accident. *Id.* ¶ 52. Plaintiff responded by yelling incoherent statements and expressing delusional beliefs. *Id.*

The following day, KBI Defendant Burk secured a search warrant for Plaintiff's home. *Id.* ¶ 53. The warrant was based on the theory that the accident was intentional. *Id.* KBI Defendants

---

[4]   The Linn County Attorney is not a party to the case.

Burk, Stokes, Beabout, and Gill executed the search warrant. *Id.* ¶ 54. The didn't find any pills, but they did photograph a bill from Larned State Hospital. *Id.*

Grimes's autopsy occurred on December 17, 2020. KBI Defendant Beabout attended and told the pathologist about the intentional-crash conclusion. *Id.* ¶ 55. The preliminary cause of death was homicide by multiple blunt force injuries. *Id.*

That same day, KBI Defendant Burk received a search warrant for Plaintiff's truck and DNA. *Id.* ¶ 56. The application for the search warrant relied on the intentional-crash theory, included false and misleading assertions, and omitted material a reasonable officer would know a judge would want to know. *Id.* The application failed to disclose that the search of the home had failed to turn up prescription medications and declared that Plaintiff had intentionally struck Grimes's car three times. *Id.*

KBI Defendant Beabout also applied for a search warrant and forensic examination of Plaintiff's phone based on the intentional-crash theory. *Id.* ¶ 62. KBI Defendant Turner conducted the search and Beabout extracted the data. *Id.*

Beabout swore a probable-cause affidavit used to charge Plaintiff with murder, including that Plaintiff intentionally caused Grimes's death by striking her car multiple times at a high rate of speed. *Id.* ¶ 59. The media reported these allegations. *Id.* Plaintiff was ultimately charged with second-degree murder. *Id.* ¶ 60.

### E.   Accident Reconstruction

Plaintiff alleges the officers failed to investigate or deliberately ignored evidence of his innocence and withheld exculpatory information. *Id.* ¶ 61. Officers also heard from witnesses that contradicted the intentional-crash theory, including that Plaintiff and his mother had a good relationship with no issues. *Id.* ¶ 63. Witnesses also said that Plaintiff likely would not have

recognized the car Grimes was driving, that there was no motive, and that Plaintiff would not have been drinking or doing drugs the day of the accident. *Id.* ¶ 64. No alcohol was found in Plaintiff's blood at the time of the crash. *Id.* ¶ 65.

The KHP provided the KBI an accident reconstruction report three months after the accident. *Id.* ¶ 66. KHP Defendant Voigts authored the report and stated that Plaintiff had driven at such a speed that it caused a significant rear-end impact with Grimes's car. *Id.* ¶ 67. According to the report, the car went off the road to the east. *Id.* The Silverado went off the road to the west, then went back to the east to strike the car again on its passenger side. *Id.*

Plaintiff's defense team hired an accident reconstruction expert. *Id.* ¶ 68. That expert found that the impact was not at highway speeds and that the second collision was not intentional because the first collision damaged the Silverado and made it impossible to steer. *Id.*

After reading the defense report, KHP Defendant Voigts asked KHP Technical Troopers for a second opinion. *Id.* ¶ 69. KHP Technical Troopers agreed with the defense report that the second collision was not intentional, and the intentional-crash conclusion was false. *Id.* ¶¶ 70-71. Voigts then contacted AG Defendants Rieg and Southall. *Id.* ¶ 70. Voigts said he had misread the data, failed to verify the data for the second collision, and had been unaware of Plaintiff's injuries. *Id.* Rieg and Southall instructed Voigts and the KHP to do a full reconstruction analysis and have the report peer reviewed by a Senior Reconstruction Analyst. *Id.* ¶ 71. Additionally, because of the defense report, Plaintiff sought and received a bond reduction. *Id.* ¶ 72. He was released on bond and placed on house arrest. *Id.* ¶ 73.

KHP Defendant Voigts subsequently issued an amended accident reconstruction report in May 2022. *Id.* ¶ 75. The amended report concluded that the initial impact occurred at between 40-55 miles per hour, that Plaintiff likely hit his head on the windshield in the first impact, that a

second impact occurred at between 9-33 miles per hour, and that the first impact caused the truck's bumper to bend into the driver's side front wheel. *Id.* ¶ 77. It stated that the initial report had been based on incomplete information and contained inaccurate conclusions. *Id.* ¶ 75. The amended report contained a disclaimer that the opinions were subject to change pending new information and that that the opinions were correct and accurate based on information currently known. *Id.* ¶ 76. The original report did not contain this disclaimer. *Id.*

AG Defendants Rieg and Southall subsequently dismissed the second-degree murder charge and replaced it with a charge of leaving the scene of an injury accident. *Id.* ¶ 78. Plaintiff pleaded no contest and was sentenced to time served. *Id.* Plaintiff claims his life has been upended by the misconduct of Defendants and that he continues to suffer headaches because he was not able to obtain follow-up care after being discharged from the hospital. *Id.* ¶ 80.

## II.    STANDARD

A complaint survives a Rule 12(b)(6) motion to dismiss when it contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible if there is sufficient factual content to allow a court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Plausibility requires "more than a sheer possibility that a defendant has acted unlawfully," but it "is not akin to a 'probability requirement.'" *Id.* "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (internal quotation and citation omitted). A court must accept as true all well-pleaded allegations in the complaint, but it does not accept legal conclusions or conclusory statements. *Id.* at 678-79.

## III.    ANALYSIS

Plaintiff alleges ten counts against at least twenty Defendants. The claims all arise under 42 U.S.C. § 1983 and allege constitutional violations for fabrication of evidence (Count One), wrongful arrest (Count Two), malicious prosecution (Count Three), failure to intervene (Count Four), conspiracy (Count Five), searching Plaintiff's home without probable cause (Count Six), searching Plaintiff's truck without probable cause (Count Seven), searching Plaintiff's person and obtaining his DNA without probable cause (Count Eight), seizing and searching Plaintiff's phone without probable cause (Count Nine), and municipal liability (Count Ten). *Id.* ¶¶ 82-154. Not all claims are against all Defendants.

The Court provides the following roadmap of the analysis.[5] First, the Court addresses the arguments raised by Defendants about Plaintiff's use of collective pleading. Second, the Court considers whether Plaintiff has stated a plausible claim for relief under Rule 12(b)(6) in Counts One, Three, Four, and Five. Third, the Court considers qualified immunity for the individual officer Defendants as to those claims. Fourth, the Court addresses the argument by the Linn County Defendants challenging Count Ten, the municipal liability and official-capacity claim. Fifth, the

---

[5]    The Linn County Defendants are named in Counts One, Three, Four, Five, and Ten. The KHP Defendants are named in Counts One, Three, Four, and Five. The Court finds that the Linn County Defendants and the KHP Defendants have challenged all the claims asserted against them in their respective motions. Some or all of the AG/KBI Defendants are named in Counts One through Nine. However, they have only meaningfully challenged some of those claims in their motion. The claims against the AG Defendants (Counts Three, Four, and Five) are extensively discussed. But the same cannot be said for all the claims against the KBI Defendants. Specifically, Counts Six through Nine are only mentioned in passing as "hav[ing] no merit" or "fail[ing] as a matter of law." Doc. 54 at 13, 15. To the extent the KBI Defendants intended to incorporate other arguments against those claims, they have not clearly done so, nor have they explained how other arguments relate to those claims. They do include a paragraph regarding wrongful arrest. But it is not clear if this argument relates to Count Two or Count Three (both are referenced or cited to). To the extent they do challenge Count Two, the motion does not discuss all named Defendants, nor is there any meaningful analysis. For these reasons, the Court finds the KBI Defendants have not meaningfully moved to dismiss Count Two and Counts Six through Nine. As stated in the conclusion, those claims remain at issue. Although the analysis is somewhat lacking on the other claims against the KBI Defendants in Counts One, Three, Four, and Five, the Court does find those claims are sufficiently challenged. Accordingly, as outlined above, the Court's analysis in this order will focus on Counts One, Three, Four, Five, and Ten.

Court addresses the claim of absolute immunity asserted by the AG Defendants on Counts Three, Four, and Five. The Court will summarize its rulings in the conclusion.

### A.    Collective Pleading

Defendants all raise concerns about Plaintiff's use of collective pleading, i.e. referring to "Defendants" or broad subcategories of Defendants such as "officers," rather than focusing on specific actions taken by specific individuals. *See* Doc. 54 at 13; Doc. 56 at 10-11; Doc. 57 at 11. In response, Plaintiff cites to *Bledsoe v. Carreno*, 53 F.4th 589, 608 (10th Cir. 2022), for the premise that collective allegations do not "doom" a pleading.

It is well established that § 1983 claims brought against individuals must be specific enough to put that particular individual on notice of the claims asserted against him and must "make clear exactly who is alleged to have done what to whom." *Id.* at 607 (internal quotation and citation omitted). A plaintiff's "facile, passive-voice showing that his rights 'were violated' will not suffice," nor will an "active-voice yet undifferentiated contention that 'defendants' infringed his rights." *Pahls v. Thomas*, 718 F.3d 1210, 1225-26 (10th Cir. 2013).

In *Bledsoe*, the Tenth Circuit stated that collective pleadings may not <u>automatically</u> warrant dismissal in every case. *Bledsoe*, 53 F.4th at 609 (stating that the "occasional use of collective references . . . does not automatically defeat [a plaintiff's] claims"). But it also specifically noted that collective allegations must be read "in tandem with . . . factual allegations elsewhere in the complaint, which identify specific actions taken by each individual [defendant]." *Id.* at 608. In *Bledsoe*, the issue was that the specific counts included references to "Defendants," whereas the rest of the complaint identified the specific conduct of each individual defendant. *See id.*

*Bledsoe* did not reject the general requirement that § 1983 claims against individuals must identify the specific objectionable action taken by that individual. That is a well-established rule

in the Tenth Circuit. A § 1983 defendant sued in his individual capacity can only be responsible for his own actions—not for an amalgamation of conduct by others. *Robbins v. Oklahoma*, 519 F.3d 1242, 1251 (10th Cir. 2008) ("In general, state actors may only be held liable under § 1983 for their own acts, not the acts of third parties."); *Pahls*, 718 F.3d at 1225 ("But common to all § 1983 and *Bivens* claims is the requirement that liability be predicated on a violation traceable to a defendant-official's own individual actions." (internal quotation and citation omitted)). While occasional collective allegations may not "doom" a complaint, as Plaintiff argues, the Tenth Circuit has warned that a plaintiff should proceed cautiously in doing so and not overly rely on collective allegations. *See Robbins*, 519 F.3d at 1249 ("Although we apply the same standard in evaluating dismissals in qualified immunity cases as to dismissals generally, complaints in § 1983 cases against individual government actors pose a greater likelihood of failures in notice and plausibility because they typically include complex claims against multiple defendants." (internal quotation and citation omitted)).

Accordingly, although the Court will not dismiss any claims based solely on Plaintiff's use of collective allegations, the Court will focus on the conduct specifically alleged to have been taken by each Defendant in determining whether a claim has been plausibly stated.[6]

### B.     Counts One, Three, Four, and Five – Failure to State a Claim

The Court has reviewed the amended complaint and identified the specific actions alleged to have been taken by the individual Defendants. It considers these allegations in analyzing whether Plaintiff has plausibly stated a claim in Counts One, Three, Four, and Five.

---

[6]     For purposes of docket management, there are two individuals who were named and served with the original complaint but who were not included in the amended complaint: Bryce Hart and Tommy Moore. The Clerk's Office is directed to reflect on the docket that Hart and Moore are no longer part of the case. Similarly, Erin Carney, Miranda Edwards, John Edwards, and Donald Banks were named in the original complaint but not served, and they are not included in the amended complaint. The Clerk's Office is directed to reflect this on the docket. There are also four categories of "unknown" defendants. The Court does not take any action on any unnamed parties.

Linn County Defendants

- <u>Friend</u>: supervised Johnson, Parscale, and Ogden, Doc. 47 at ¶¶ 14-15; responsible for the policies, practices, and customs of the Linn County Sheriff's Department that caused the claims in this case, *id.* ¶ 150; failed to train, *id.* ¶ 149.

- <u>Johnson</u>: supervised Parscale and Ogden, *id.* ¶¶ 14-15; responsible for the policies, practices, and customs of the Linn County Sheriff's Department that caused the claims in this case, *id.* ¶ 150; failed to train, *id.* ¶ 149.[7]

- <u>Parscale</u>: was first on the scene, *id.* ¶ 31; knew Plaintiff and knew that Plaintiff reported hitting his head in the accident, *id.*; immediately decided Plaintiff had intentionally crashed, *id.* ¶ 34.

- <u>Ogden</u>: was familiar with Plaintiff, *id.* ¶ 33; told others at the scene that Plaintiff's father had shot himself and was heard saying "Ol' Rocky Allen," *id.*; told KHP Defendant Raines what he and Parscale had observed and decided about the crash, *id.* ¶ 36; intentionally switched off his body camera to conceal his words and actions, *id.* ¶ 37; observed a damaged fence post and reported that Plaintiff had hit it, *id.* ¶ 38.

KHP Defendants[8]

- <u>Bachert</u>: was sent to collect Plaintiff's blood at the hospital and observed him to be agitated, *id.* ¶ 40.

- <u>Drennan</u>: told KBI Defendants Gill and Burk what they had learned from the Linn County Defendants and other KHP Defendants, including that Plaintiff hit Grimes's car at highway speeds, turned around, and hit the car again, *id.* ¶ 44.

- <u>Raines</u>: observed a damaged fence post and told others that Plaintiff hit it, *id.* ¶ 38.

---

[7]   Plaintiff sues Linn County Defendants Friend and Johnson both in their individual and official capacities in Counts One, Three, Four, and Five. But there are no allegations that Friend or Johnson was otherwise personally involved in this case or took any action toward Plaintiff, other than in their role as supervisors to Parscale and Ogden. Supervisory liability may apply against a defendant "who creates, promulgates, or implements a policy that injures that plaintiff's constitutional rights." *George, on behalf of Bradshaw v. Beaver Cnty., by & through Beaver Cnty. Bd. of Comm'rs*, 32 F.4th 1246, 1255 (10th Cir. 2022). "But supervisors are not vicariously liable for their employees' acts." *Id.* Given that Plaintiff has not made any factual allegations against Friend or Johnson beyond their supervisory role, the Court finds Plaintiff has failed to state a claim against them in their individual capacity and dismisses Counts One, Three, Four, and Five against Friend and Johnson. The Court separately addresses the official-capacity claim (Count Ten) against them below.

[8]   KHP Defendants Tarpley and Presley are named in the amended complaint but are not ever accused of factually doing anything with regard to this case. They are only mentioned in the two paragraphs of the amended complaint identifying the individuals who make up the KHP Defendants. *See* Doc. 47 at ¶¶ 19-20. They are not otherwise discussed, nor are they alleged to have taken any action toward Plaintiff. The Court therefore dismisses all claims against Tarpley and Presley because Plaintiff has not pleaded any facts specifically as to them and has therefore failed to state a § 1983 claim against them.

- <u>Voigts</u>: told KBI Defendants Gill and Burk what they had learned from the Linn County Defendants and other KHP Defendants, including that Plaintiff hit Grimes's car at highway speeds, turned around, and hit the car again, *id.* ¶ 44; authored an accident reconstruction report that noted multiple intentional impacts, *id.* ¶ 67; described the report as a "forensic map narrative" and said he was not an expert, *id.* ¶ 69; sought a second opinion from KHP Technical Troopers after reading the report from Plaintiff's expert, *id.* ¶ 69; emailed AG Defendants Rieg and Southall after consulting with KHP Technical Troopers, who had agreed there was no evidence of an intentional impact, *id.* ¶ 70; misread data underlying the report and failed to verify the data, *id.*; issued an amended report that acknowledged the first report was based on incomplete opinions and inaccurate data, *id.* ¶¶ 75-76.

<u>AG/KBI Defendants</u>

- <u>Rieg</u>: was told that KHP Technical Troopers agreed with Plaintiff's expert that the second impact was not intentional and that the intentional-crash conclusion was false, *id.* ¶¶ 70-71; told KHP Defendant Voigts to do a full accident reconstruction analysis, *id.* ¶ 71; instructed Voigts that the accident reconstruction report should be peer reviewed by a Senior Reconstruction Analyst, *id.*; dismissed the second-degree murder charge against Plaintiff and replaced it with a charge of leaving the scene of an injury accident, *id.* ¶ 78.

- <u>Southall</u>: was told that KHP Technical Troopers agreed with Plaintiff's expert that the second impact was not intentional and that the intentional-crash conclusion was false, *id.* ¶¶ 70-71; told KHP Defendant Voigts to do a full accident reconstruction analysis, *id.* ¶ 71; dismissed the second-degree murder charge against Plaintiff and replaced it with a charge of leaving the scene of an injury accident, *id.* ¶ 78.

- <u>Beabout</u>: wrote a report reflecting the intentional-crash theory, *id.* ¶ 46; interviewed witnesses who said Plaintiff reported hitting his head in the accident and that he didn't see Grimes's car, *id.* ¶ 48; directed KBI Defendants Stokes and Gillespie to arrest Plaintiff at the hospital, *id.* ¶ 49; tried to interview Plaintiff despite him showing signs of injury, *id.* ¶ 52; executed a search warrant in the case, *id.* ¶ 54; told a pathologist about the intentional-crash theory, *id.* ¶ 55; collected Plaintiff's DNA, *id.* ¶ 58; swore a probable cause affidavit that was used to charge Plaintiff and stated that Plaintiff intentionally caused his mother's death, *id.* ¶ 59; sought a forensic exam of and seized information from Plaintiff's phone based on the intentional-crash theory, *id.* ¶ 62; falsified an arrest affidavit by mischaracterizing Plaintiff's actions, reporting that an interview ended due to bizarre behavior and not because Plaintiff needed medical attention, and relying on the intentional-crash theory, *id.* ¶¶ 89-97; entered Plaintiff's home without probable cause, *id.* ¶ 120; collected Plaintiff's DNA without probable cause, *id.* ¶ 135; in the context of the search of Plaintiff's phone, failed to disclose what witnesses had told him, including that Grimes was not reconsidering her estate planning, that there was nothing in the relationship between Grimes and Plaintiff that would have provided a motive, and that Plaintiff had been sober for three weeks before the accident, *id.* ¶¶ 139-145.

- <u>Burk</u>: applied for a search warrant of Plaintiff's home repeating the intentional-crash theory and other false and misleading statements, *id.* ¶ 53; executed a search warrant in the case,

*id.* ¶ 54; applied for a search warrant of Plaintiff's car and DNA using the intentional-crash theory and omitting other facts, including that no medications were found at Plaintiff's house, *id.* ¶ 56; performed a search of Plaintiff's truck, *id.* ¶ 57; entered Plaintiff's home without probable cause, *id.* ¶ 120; falsified a warrant application for Plaintiff's home by stating that the truck hit the car three times, while omitting that Plaintiff asked for medical attention during an interview, and that Plaintiff's girlfriend contradicted his statements about drug and alcohol use and said he would not have recognized Grimes's car, *id.* ¶ 122; falsified a warrant application to search Plaintiff's car, including by stating that Plaintiff walked away from the scene and admitted to smoking marijuana, and by omitting that the phone was already in police custody and the search of Plaintiff's home did not turn up any medications, *id.* ¶ 127; falsified the application to obtain Plaintiff's DNA by stating it was needed to prove Plaintiff was the driver even though he had already been arrested, and by stating that Plaintiff walked away from the accident even though he returned *id.* ¶ 133; improperly collected Plaintiff's DNA, *id.* ¶ 134.

- <u>Gill</u>: executed a search warrant in this case, *id.* ¶ 54; collected Plaintiff's DNA, *id.* ¶ 58; entered Plaintiff's home to search without probable cause, *id.* ¶ 120.

- <u>Gillespie</u>: arrested Plaintiff and drove him to jail while he was making erratic statements, *id.* ¶ 51.

- <u>Smith</u>: called KBI Defendant Beabout to report the KHP's conclusions, namely that the collision was intentional, *id.* ¶ 45.

- <u>Stokes</u>: arrested Plaintiff and drove him to jail while he was making erratic statements, *id.* ¶ 51; tried to interview Plaintiff despite him showing signs of injury and failed to end the interview when Plaintiff asked for a doctor, *id.* ¶ 52; executed a search warrant in this case, *id.* ¶ 54; entered Plaintiff's home to search without probable cause, *id.* ¶ 120.

- <u>Turner</u>: conducted a search of Plaintiff's phone without probable cause, *id.* ¶¶ 62, 142.

With these factual allegations in mind, the Court considers whether Plaintiff has stated a plausible § 1983 claim for fabrication (Count One), malicious prosecution (Count Three), failure to intervene (Count Four), and conspiracy (Count Five).

### 1.    Count One – Fabrication of Evidence

Plaintiff asserts a § 1983 claim for fabrication of evidence against each of the individuals listed above except Rieg and Southall. A fabrication-of-evidence claim has four elements: "(1) the defendant knowingly fabricated evidence, (2) the fabricated evidence was used against the plaintiff, (3) the use of the fabricated evidence deprived the plaintiff of liberty, and (4) if the alleged

unlawfulness would render a conviction or sentence invalid, the defendant's conviction or sentence has been invalidated or called into doubt." *Truman v. Orem City*, 1 F.4th 1227, 1236 (10th Cir. 2021). The intent element of such a claim requires that a defendant "necessarily must possess knowledge of the evidence's falsity." *Id.*

An initial difficulty in analyzing Count One is that it is unclear what, if any, actual <u>evidence</u> Plaintiff claims was fabricated or falsified. The focus of the case is that the intentional-crash theory was wrong. Presumably, the actual "evidence" that is claimed to have been fabricated is the accident report that incorporated that theory, though it's not entirely clear. To the extent that is the case, the Court notes that only two individual Defendants (KHP Defendant Voigts and KBI Defendant Beabout) are alleged to have authored reports reflecting the intentional-crash theory. It's not clear what "evidence" the others are alleged to have fabricated, other than that they participated in the investigation that pursued the intentional-crash theory. And some Defendants only had a brief role in the case that had nothing to do with determining the nature of the crash. For example, Bachert only collected Plaintiff's blood. Gillespie and Stokes arrested Plaintiff and drove him to the jail. Drennan and Smith only repeated the conclusion drawn by others. Burk, Gill, and Turner obtained search warrants and conducted searches. Although Plaintiff separately challenges those warrants, it's not clear how any fabrication claim is related to those warrants.[9] None of these allegations point to the fabrication of any evidence, leaving the Court with some difficulty in analyzing this claim against the 17 individual Defendants it is asserted against.

The Court will presume that Count One is based on the conclusion of the investigation that Plaintiff intentionally collided with his mother's car. *See* Doc. 47 at ¶ 84. Assuming that such a

---

[9] As explained above, the claims challenging those search warrants are not currently at issue. Nor does Plaintiff point to any evidence obtained via those warrants that he claims was fabricated. It's not even clear what impact, if any, the search warrants had on Plaintiff's prosecution.

conclusion could suffice for a fabrication-of-evidence claim, and assuming all Defendants are alleged to have had a hand in developing this conclusion, the Court turns to whether such a claim has been plausibly stated, i.e. whether Plaintiff has plausibly pleaded that Defendants knowingly fabricated the intentional-crash theory. Defendants all argue that there are no plausible allegations that any of them <u>knew</u> the intentional-crash theory was false but pursued it anyway. *See* Doc. 54 at 13-14; Doc. 56 at 12; Doc. 57 at 12. The Court agrees that Plaintiff's claim fails to allege facts supporting this element. *See Truman*, 1 F.4th at 1236.

Plaintiff highlights certain allegations that he says plausibly allege that Defendants knowingly fabricated the intentional-crash theory. *See* Doc. 64 at 2; Doc. 62 at 12-13. But many of the cited allegations are just conclusory statements. *See, e.g.*, Doc. 64 at 2 (citing to paragraph 84 of the amended complaint, which states that "Defendant Officers fabricated evidence that Plaintiff intentionally collided with his mother's car multiple times"*)*. Conclusory statements cannot beat a motion to dismiss. *See Iqbal*, 556 U.S. at 678-79. Rather, Plaintiff must point to <u>facts</u> in the amended complaint that would plausibly allege a <u>knowing</u> fabrication.

Plaintiff points to the fact that the accident report was eventually revised. He argues that the "more faithful interpretation [of this fact] is that Voigts and the KHP Defendants were forced to correct the report after its fabrications were revealed." Doc. 64 at 3. Regardless of whether this is a <u>reasonable</u> inference to draw from the fact that the report was later corrected, it still misses the mark. True, the intentional-crash theory was eventually proven incorrect. And the report was corrected. But it doesn't follow—and there are no factual allegations that support a conclusion— that Defendants <u>knew</u> it was false to begin with. *See Truman*, 1 F.4th at 1238 (finding a plausible claim for fabrication where a prosecutor was alleged to have known a crime scene diagram was inaccurate and the allegation was supported "with specific facts, like the prosecutor's multiple

visits to the Truman home, his attendance at a crime scene reconstruction, and his viewing of photos from the crime scene reconstruction"). To the contrary, by Plaintiff's own allegations, the intentional-crash theory and initial accident report were only changed when Plaintiff's expert pointed out errors in the original analysis. It is at most an allegation of negligence on the part of the investigating officers, which is not sufficient to sustain a fabrication-of-evidence claim. *See Taylor v. Meacham*, 82 F.3d 1556, 1563 (10th Cir. 1996) ("Moreover, Mr. Taylor has presented us with no evidence which even suggests that Sheriff Meacham included the false statements, or omitted any facts, knowingly or with reckless disregard for the truth, rather than out of negligence or inadvertence.").[10]

Plaintiff also argues that a knowing fabrication can be inferred based on three allegations. *See* Doc. 63 at 3-4.[11] First, Linn County Defendants Parscale and Ogden knew Plaintiff before the accident. Plaintiff argues that from this "the Court can infer that both had formed an opinion about [Plaintiff] that predated their investigation." *Id.* at 3. The Court disagrees. True, the amended complaint states that Plaintiff had known Parscale for about two years. Doc. 47 at ¶ 31. Ogden was also "familiar" with Plaintiff and knew that Plaintiff's father had shot himself a few years earlier. *Id.* ¶ 33. He also was heard saying "Ol' Rocky Allen." *Id.* But even if these facts plausibly allege that Parscale and Ogden had prior relationships with Plaintiff, they do not support a reasonable inference that Parscale and Ogden—let alone any other Defendant—had a <u>negative</u> opinion about Plaintiff such that they would be motivated to have knowingly fabricated evidence. *See Johnson v. City of Cheyenne*, 99 F. 4th. 1206, 1229 (10th Cir. 2024) (noting that even if a court could

---

[10] The amended complaint does state that KHP Defendant Voigts misread and failed to verify some data in the original report. Doc. 47 at ¶¶ 69-70. Plaintiff does not argue that this negligence, to the extent it was that, was so egregious as to warrant an inference that he knowingly falsified conclusions in the accident report.

[11] This argument was made in response to the Linn County Defendants' motion to dismiss, but the Court will consider it as to all Defendants.

conclude that missing photographs were destroyed or misplaced, it would not assume the missing photographs contained any particular images because doing so "would be to engage in pure speculation and conjecture, and that we will not do").

Second, Plaintiff points to the allegations that both Parscale and Ogden "made unfounded statements about the evidence." Doc. 63 at 3. But again, although Parscale's and Ogden's conclusions about the evidence proved to be wrong, that doesn't mean that those conclusions were <u>knowingly</u> false when made. If this were sufficient, any officer who made a flawed evaluation of the evidence could be personally liable for fabrication of evidence under § 1983. This would essentially eviscerate the intent element identified by the Tenth Circuit. *See Truman*, 1 F.4th at 1236; *see also Paylan v. Teitelbaum*, 798 F. App'x 458, 466 (11th Cir. 2020) (noting that a mistaken connection between facts is not the same as fabrication).

Third, Plaintiff points to allegations that Parscale and Ogden told their incorrect conclusion about the accident to others. Doc. 63 at 4. But this doesn't lead to a reasonable inference that this was knowing fabrication by Parscale and Ogden, let alone any other Defendant.

In sum, the Court agrees that Plaintiff has failed to state a claim for fabricating evidence. The only facts alleged are that some Defendants concluded the accident was intentional and proceeded with the investigation under that theory. Although that conclusion was proven wrong, Plaintiff has not pleaded any facts that plausibly suggest that any Defendant knew it was wrong to begin with but pursued it anyway.[12] Without factual allegations on that point, the Court finds Plaintiff has failed to state a claim or fabrication of evidence and dismisses this claim in full.

---

[12]  Because Plaintiff's allegations fail on the first element, the Court does not reach the remaining elements for fabrication of evidence.

### 2.   Count Three – Malicious Prosecution

Plaintiff asserts a § 1983 claim for malicious prosecution against all the individual Defendants.[13] A § 1983 malicious-prosecution claim has five elements: "(1) the defendant caused the plaintiff's prosecution; (2) the original action terminated in favor of the plaintiff; (3) no probable cause supported the continued prosecution; (4) the defendant acted with malice; and (5) the plaintiff sustained damages." *Bledsoe v. Jefferson Cnty., Kan.*, 275 F. Supp. 3d 1240, 1255 (D. Kan. 2017). On the second element, favorable termination, "a plaintiff need only show that his prosecution ended without a conviction." *Thompson v. Clark*, 596 U.S. 36, 39 (2022).

Defendants argue that there is no factual basis that any of the officers caused Plaintiff's confinement or prosecution. Doc. 54 at 9, 13; Doc. 56 at 13; Doc. 57 at 14. A defendant does not actually have to be the one who initiates the prosecution to satisfy causation; "one who prevaricates and distorts evidence to convince the prosecuting authorities to press charges can be said to cause the prosecution." *Bledsoe*, 275 F. Supp. 3d at 1255 (internal quotation and citation omitted); *see also Sanchez v. Hartley*, 810 F.3d 750, 758 (10th Cir. 2016) ("[T]he four detectives and investigator would incur liability under a malicious-prosecution theory if they knowingly or recklessly used false information to institute legal process."). Thus, the theory that a defendant "fabricated or conspired to fabricate" evidence of guilt can be said to have caused a malicious prosecution. *Bledsoe*, 53 F.4th at 614; *see also Carbajal v. McCann*, 808 F. App'x 620, 633 (10th Cir. 2020) ("Police officers . . . can be liable for malicious prosecution if they misrepresent facts or conceal them from the prosecutor.").

---

[13]   The Court focuses on the conduct of the officers in the analysis of Counts Three, Four, and Five, although Plaintiff also asserts these claims against the AG Defendants. The Court separately finds that AG Defendants Rieg and Southall are entitled to absolute prosecutorial immunity on these claims, as discussed below.

Here, the gist of Plaintiff's case is that Defendants caused his prosecution by fabricating the intentional-crash theory. *See, e.g.*, Doc. 63 at 6; Doc. 64 at 5. But as discussed above, Plaintiff has not pleaded any facts that would plausibly suggest Defendants knowingly fabricated any evidence. Nor are there any plausible allegations that any of the officers caused his prosecution by any other means. *See Taylor*, 82 F.3d at 1563-64 ("He does not seriously allege that Sheriff Meacham made false or misleading statements following his arrest, nor that he somehow caused false or perjured testimony to be presented at the preliminary hearing."). Therefore, Plaintiff's malicious-prosecution claim fails for the same reason that the fabrication claim fails—there are no viable allegations that any Defendants fabricated evidence in order to cause his prosecution. This claim is dismissed.

### 3. Count Four – Failure to Intervene

Plaintiff asserts a § 1983 claim for failure to intervene against the individual Defendants. Plaintiff's failure-to-intervene claim states that Defendants failed to intervene to prevent Plaintiff's "malicious prosecution and deprivation of liberty without due process of law." Doc. 47 ¶ 108.

Law enforcement officers have a duty to intervene to stop constitutional violations by other officers in their presence. *Bledsoe*, 53 F.4th at 616. To allege a claim for failure to intervene, a plaintiff must plead facts showing that "1) a government officer violated his constitutional rights, 2) a different government actor (the defendant) observed or had reasons to know about that constitutional violation, and 3) the defendant had a realistic opportunity to intervene, but failed to do so." *Id.*

A difficulty in analyzing Plaintiff's failure to intervene claim is that, like the underlying alleged constitutional violations of fabrication of evidence and malicious prosecution, it is directed at all individual Defendants. In other words, all individual Defendants are alleged to have

personally violated Plaintiff's constitutional rights and to have simultaneously failed to intervene to stop that violation of constitutional rights. But there is no allegation about specifically how or when any particular Defendant failed to intervene in an action taken by another Defendant. It's also unclear how an individual could be held liable for failing to intervene in their own alleged constitutional violation. The standard for evaluating a claim for failing to intervene presumes two different actors—one who violates the constitution and one who observes but fails to intervene. *Id.*[14] No such distinction can be drawn here. Plaintiff's failure to identify the specific actions complained of as to each Defendant warrants dismissal of this claim as to them all.

The only fact Plaintiff relies on is that Defendants knew about the constitutional violations and had a reasonable chance to intervene because the accident happened in a small town, the events at issue lasted over two years, and "everyone in the community knew." Doc. 63 at 11; Doc. 64 at 12-13. The Court disagrees that this plausibly alleges any particular Defendant had a reasonable opportunity to intervene in an alleged constitutional violation. The fact that "everyone in the community" knew about the prosecution does not lead to a reasonable inference that each individual Defendant knew about a constitutional violation and had a reasonable opportunity to intervene.

Additionally, to the extent Plaintiff claims the constitutional violation that each Defendant failed to intervene in was the fabrication of evidence and related malicious prosecution, the Court has found he has not plausibly alleged any such constitutional violation. Accordingly, Plaintiff has likewise failed to plausibly allege any claim for failure to intervene in such a constitutional violation. Count Four is therefore dismissed.[15]

---

[14]  Otherwise, any defendant who violated the constitution would be on the hook for both that violation and for failing to intervene to stop themselves from committing the violation. That is nonsensical.

[15]  As noted above, there are generally no facts alleging the involvement of Linn County Defendants Friend or Johnson beyond their supervisory role over Linn County Defendants Parscale and Ogden. However, as to this claim,

###### 4.      Count Five – Conspiracy

Count Five is a civil rights conspiracy under § 1983. "A federal conspiracy action under § 1983 requires at least a combination of two or more persons acting in concert and an allegation of a meeting of the minds, an agreement among the defendants, or a general conspiratorial objective." *Givens v. City of Wichita*, 2024 WL 1198503, at *21 (D. Kan. 2024) (internal quotation and citation omitted). A plaintiff pleads a § 1983 conspiracy claim by alleging "specific facts showing an agreement and concerted action among defendants." *Bledsoe*, 53 F.4th at 609 (internal quotation and citation omitted). There must also be facts alleging a "common, unconstitutional goal" and "concerted action." *Id.* (internal quotation and citation omitted). Assent can be inferred from acts furthering the conspiracy's goal. *Id.* There does not need to be an express agreement but "participants in the conspiracy must share the general conspiratorial objective." *Frasier v. Evans*, 992 F.3d 1003, 1024 (10th Cir. 2021). Conclusory allegations of a conspiracy do not suffice. *Tonkovich v. Kan. Bd. of Regents*, 159 F.3d 504, 533 (10th Cir. 1998).

Conclusory allegations of a conspiracy are all Plaintiff has provided here. Plaintiff contends that the amended complaint alleges that KHP Defendant Raines and Linn County Defendants Parscale and Ogden "agreed to fabricate the intentional-crash conclusion at the scene." Doc. 64 at 14. But the portions of the amended complaint cited by Plaintiff only allege that Parscale and Ogden concluded the crash was intentional and shared this information with Raines, who also concluded that the damaged fence post indicated an intentional crash. *See* Doc. 47 at 9-10. Even if

---

Plaintiff argues that it should be inferred from their supervisory role that Friend and Johnson knew of the constitutional violations and failed to intervene. Doc. 63 at 11. Plaintiff cites *Bledsoe* for the proposition that "it's reasonable to infer that the officers working on the investigation shared information." *Id.* (citing *Bledsoe*, 53 F.4th at 611). But there are <u>no</u> allegations that Friend and Johnson were working on this investigation or had any involvement or knowledge about it. Inferring liability for Friend and Johnson based on these facts, as Plaintiff suggests, would effectively circumvent the rule that supervisors are not held liable simply by their role as supervisors. *See George*, 32 F.4th at 1255.

these actions of three Defendants could be read to expand the conspiracy to all Defendants, they

do not suggest a conspiratorial objective. Nor does the fact that KHP Defendant Voigts repeated

the intentional-crash theory in the accident reconstruction report. At most, this shows the officers

worked together on the <u>investigation</u>. But that alone is not enough to show a conspiracy to violate

Plaintiff's constitutional rights. *See Grider v. City of Auburn, Ala.*, 618 F.3d 1240, 1260 (11th Cir.

2010) ("At best, the record shows that Maddox and Neal assisted Carver (and other officers) in

investigating Skybar and the Griders . . . But showing that Maddox and Neal 'conspired' to

investigate Skybar, which is lawful and part of their duties as law enforcement officers, is a far cry

from showing that Maddox and Neal agreed to fabricate, and then maliciously prosecute Grider

for, a bribery crime he did not commit.").[16] And contrary to Plaintiff's assertion, parallel action is

not suggestive of a conspiratorial intent. *See Frasier*, 992 F.3d at 1025 ("Therefore, proof that

defendants engaged in '[p]arallel action . . . does not necessarily indicate an agreement to act in

concert.'" (internal citation omitted)).

   In sum, Plaintiff at most pleads facts suggesting multiple law enforcement officers worked

together on an investigation and shared conclusions. That does not plausibly suggest a conspiracy

---

[16] Plaintiff also argues it is reasonable to infer that Linn County Defendants Friend and Johnson were part of the conspiracy because Linn County requested help from the KHP and KBI, and it is "reasonable to infer that the request for assistance to the KBI could not have come without Sheriff Friend's or [Undersheriff Johnson's] authorization, which would only have come after they heard the intentional-crash conclusion." Doc. 63 at 13. Again, however there are no facts alleged about Friend and Johnson, other than they supervised Parscale and Ogden. It is too far a leap to infer from that single fact that Friend and Johnson knew of the intentional-crash theory, knew it was fabricated, and then authorized the involvement of state agencies as part of a conspiracy to frame Plaintiff. Plaintiff cites *Bledsoe* for the position that general allegations that a Sheriff "supervised the officers who did undertake more specific unlawful actions supports an inference that he knew about and participated in the conspiracy . . . ." *Id.* (citing *Bledsoe*, 53 F.4th at 611). But the supervisor defendant in *Bledsoe* had participated directly in some of the unconstitutional actions. *Bledsoe*, 53 F.4th at 611 (noting that the defendant at issue had "the fewest specific allegations," but was still involved in declining to search for exculpatory evidence, performing searches, and allowing third parties to handle evidence). It was those specific allegations on top of the fact that he supervised others that allowed him to be charged in the conspiracy. *Id.* Here, by contrast, the only allegation against Friend and Johnson is that they were supervisors. This is not enough to hold them personally liable for conspiracy.

even if the conclusion ultimately proved to be incorrect. The Court therefore finds Plaintiff has failed to state a plausible conspiracy claim.[17]

### C.      Counts One, Three, Four, and Five – Qualified Immunity

The individual Defendants assert qualified immunity.[18] Qualified immunity is meant to protect public servants—"all but the plainly incompetent or those who knowingly violate the law"—from the burdens of lawsuits. *Lewis v. Tripp*, 604 F.3d 1221, 1225 (10th Cir. 2010) (internal quotation and citation omitted). Once a defendant asserts qualified immunity, the plaintiff must show that: (1) the defendant's actions violate a constitutional right and (2) the constitutional issue was clearly established at the time of defendant's actions. *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001).

The Court has already found that Plaintiff has failed to state a plausible claim against the individual Defendants on Counts One, Three, Four, and Five. These claims are therefore alternatively dismissed on grounds of qualified immunity under the first prong. However, the

---

[17]   Defendants raise *Heck v. Humphrey* as grounds to dismiss these claims. Because the Court finds Plaintiff has failed to state a claim in Counts One, Three, Four, and Five, it does not reach that argument.

[18]   Plaintiff argues that it is Defendants who "bear the burden of establishing the affirmative defense of qualified immunity." Doc. 64 at 16 (citing *Gross v. Pirtle*, 245 F.3d 1151, 1155 (10th Cir. 2001)); *see also* Doc. 62 at 15. That's not correct. As the Tenth Circuit stated in *Gross*, a defendant must only <u>assert</u> qualified immunity, and then the burden shifts to the plaintiff to show that qualified immunity should not apply under the two-step test. 245 F.3d. at 1155-56 ("If the plaintiff fails to satisfy either part of the two-part inquiry, the court must grant the defendant qualified immunity."). Here, all individual Defendants have asserted qualified immunity, at least as to Counts One, Three, Four, and Five. Doc. 54 at 1, 8; Doc. 56 at 18-19; Doc. 57 at 19-20. Admittedly, the KBI Defendants' briefing on qualified immunity is somewhat underdeveloped and only briefly invokes the defense. Doc. 54 at 1, 8. However, Plaintiff has substantively responded to the claim of qualified immunity as to all Defendants. Doc. 62 at 16-17; Doc. 63 at 16-17; Doc. 64 at 16-18. Given this, the Court finds qualified immunity is appropriately considered at this stage as to Counts One, Three, Four, and Five and as to all individual Defendants. This is particularly true given that the analysis in part turns on the existence of clearly stablished law, which is Plaintiff's burden to show, and which would apply to all Defendants. However, the Court reiterates its conclusion that that no meaningful arguments have been raised by KBI Defendants as to Counts Two and Six through Nine. This includes qualified immunity. Put another way, nothing in this order should be interpreted as a substantive ruling on whether the KBI Defendants are entitled to qualified immunity on Counts Two and Six through Nine. To the extent the KBI Defendants wish to assert qualified immunity as to those claims, they may do so at an appropriate time in accordance with the Federal Rules of Civil Procedure.

individual Defendants are also entitled to qualified immunity under the second prong of the analysis.

On the second prong, the Supreme Court has "repeatedly told courts not to define clearly established law at too high a level of generality." *City of Tahlequah, Oklahoma v. Bond*, 595 U.S. 9, 12 (2021). "It is not enough that a rule be suggested by then-existing precedent." *Id.* Rather, the contours of the rule must be "so well defined" that it would have been clear to a reasonable officer that his conduct was unconstitutional. *Id.* There need not be a case directly on point, but judicial precedent must have "placed the statutory or constitutional question beyond debate." *Knopf v. Williams*, 884 F.3d 939, 944 (10th Cir. 2018) (internal quotation and citation omitted). This standard is generally met by pointing to a Supreme Court or Tenth Circuit case that is on point. *Id.*

Plaintiff has not met his burden of pointing to clearly established law that would overcome qualified immunity on Counts One, Three, Four, or Five. Plaintiff cites to some cases that he says establish that his various claims were clearly established. Doc. 62 at 17; Doc. 64 at 17-18. The Court has reviewed those cases. None of them are sufficiently on point to be considered clearly established authority in this case.

Plaintiff relies on *Anthony v. Baker* to argue conspiring to fabricate evidence is a clearly established constitutional violation. There, an officer pursued a claim for insurance fraud even though the insurance company had not made any complaints. *Anthony v. Baker,* 767 F.2d 657, 664-65 (10th Cir. 1985). There was evidence that the defendant had knowingly seized the wrong evidence but said he did not care, that he was going to get the plaintiff "whatever it took," and that the defendant was not acting fairly or objectively in the investigation. *Id.* at 665. Another expert characterized the defendant's actions as "a continual, blatant, unrelenting effort" to see the plaintiff convicted "at virtually any cost." *Id.* Although the Tenth Circuit did acknowledge that a state actor

can be liable for conspiring to pursue indictments based on fabricated or distorted evidence, *id.* at 662, the case is not otherwise factually on point with this one and it would not have put any Defendants on notice about their conduct in this case. Notably, the court in *Anthony* also found that claims against other officers who assisted on the investigation were properly dismissed where there was "no evidence that Newton conspired with Baker to taint the probable cause determinations or that he proceeded in a malicious manner." *Id.* at 666.

*Bledsoe* involved a "dark picture of law enforcement's plot to convict Bledsoe falsely." 53 F.4th at 595.There, a 14-year-old girl was murdered. Tom Bledsoe, who had "a history of troubling sexual behavior that included pursuing young girls," separately told two parties that he had killed the girl, gave details of how, and led officers to her body. *Id.* at 596. Her wounds matched Tom's description of how he claimed to have killed her. *Id.* Despite this evidence, numerous individuals, including Tom's attorney, the prosecutor, and several law enforcement officers, decided to frame Tom's brother Floyd for the murder, even though Floyd had an alibi. *Id.* The defendants coached Tom into recanting his confession while stating that he only learned the inculpatory details from Floyd at a fictious roadside meeting. *Id.* Tom's defense attorney allegedly told Floyd that he was taking Tom off the hot seat and putting Floyd on it. *Id.* Tom took a lie detector test and failed, and he again confessed, but an officer told him to continue lying to keep implicating his brother. *Id.* at 597. Floyd passed the lie detector test, but officers falsified the results to make it look like Floyd was guilty and Tom was innocent. *Id.* In addition to generating false evidence, the officers failed to disclose Tom's inculpatory statements and incriminating past behaviors. *Id.* Officers also "skewed the investigation" toward Floyd and away from Tom by searching Floyd's home but not Tom's home and by not gathering physical evidence from the shovel Tom said he used to bury the girl. *Id.* After Floyd was convicted and spent over a decade in prison, DNA tests showed a match

to Tom, not Floyd. *Id.* at 598. Tom subsequently committed suicide and left a note stating that he had killed the girl and that he had been forced by various officials to frame Floyd. *Id.* Perhaps obvious, but the egregious facts of the *Bledsoe* case are not on all fours with the facts of this case.[19]

Plaintiff alternatively relies on *Hope v. Pelzer*, 536 U.S. 730 (2002), for the position that "the violation of Mr. Allen's constitutional rights would have been obvious to any objectively reasonable officer." Doc. 62 at 17. The Court disagrees that the facts alleged, along with every reasonable inference taken in favor of Plaintiff, rise to the level of a patently obvious constitutional violation. *Cf. Hope*, 536 U.S. at 738 ("Despite the clear lack of an emergency situation, the respondents knowingly subjected him to a substantial risk of physical harm, to unnecessary pain caused by the handcuffs and the restricted position of confinement for a 7-hour period, to unnecessary exposure to the heat of the sun, to prolonged thirst and taunting, and to a deprivation of bathroom breaks that created a risk of particular discomfort and humiliation."). Although Defendants' intentional-crash theory was ultimately proven incorrect, it was not so patently unconstitutional given the somewhat curious facts surrounding the accident. This is especially true given the Court's conclusion that Plaintiff has failed to state a constitutional violation on Counts One, Three, Four, and Five, as discussed throughout.

As the Supreme Court has cautioned, the second prong of the qualified immunity analysis requires something more than a case generally standing for the proposition that a particular claim exists. *City of Tahlequah*, 595 U.S. at 12. It does not suffice to simply point to a case that

---

[19] Plaintiff also relies on *Bledsoe* for the proposition that failure-to-intervene claims outside the excessive-force context were recognized in 2022. *See* Doc. 62 at 17; *see also Bledsoe*, 53 F.4th at 617 ("We hold that a failure-to-intervene claim is not limited to excessive force violations, but can involve other underlying constitutional violations."). The accident in this case occurred in December 2020, and Plaintiff pleads that the murder charge was dismissed against him "[n]early two years after" the accident. Doc. 47 at ¶¶ 26, 78. Because the alleged failure to intervene apparently occurred between 2020 and 2022, *Bledsoe*, which was decided in November 2022, is not clearly established authority that would have been available to guide Defendants' actions.

recognized a cause of action. Rather, the precedent must be such that it would the Defendants in this case on notice that what <u>they</u> did was unconstitutional. Plaintiff's reliance on cases generally acknowledging the existence of certain § 1983 claims does not meet his burden. The individual Defendants are therefore entitled to qualified immunity, and Counts One, Three, Four, and Five are alternatively dismissed for this reason.

### D.     Count Ten – Municipal Liability and Official Capacity Claim

Linn County Defendants move to dismiss the municipal liability claim against the Linn County Board of Commissioners and against Friend and Johnson in their official capacity.[20] A municipality is not liable solely because an employee caused injuries to a plaintiff. *Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010). Rather, there must be a municipal policy or custom, and a causal link between that policy or custom and the plaintiff's injury. *Id.* "A policy or custom includes a formal regulation or policy statement, an informal custom that amounts to a widespread practice, decisions of municipal employees with final policymaking authority, ratification by final policymakers of the decisions of subordinates to whom authority was delegated, and the deliberately indifferent failure to adequately train or supervise employees." *Pyle v. Woods*, 874 F.3d 1257, 1266 (10th Cir. 2017).

Linn County Defendants first argue Plaintiff cannot sustain a municipal liability claim because he has not stated any underlying constitutional violation by any of the individual Linn County Defendants. Where there is no underlying constitutional violation by an individual, there

---

[20] This claim is only asserted against the Linn County Board of Commissioners, Friend, and Johnson. No other Defendants are named in Count Ten. The Court notes that official capacity claims against Friend and Johnson are likely redundant of any claim against the Linn County Board of Commissioners. *See Carbajal*, 808 F. App'x at 637 ("These § 1983 official-capacity claims 'represent only another way of pleading an action against [the] entity of which [these individuals are] an agent.'" (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978))); *see also Taylor*, 82 F.3d at 1564 (noting that official capacity suits should be treated as a suit against the entity).

is can be no municipal liability. *Johnson*, 99 F.4th at 1233. Here, the Court has found Plaintiff has failed to state an individual-capacity claim against any individual Linn County Defendant for fabrication of evidence (Count One), malicious prosecution (Count Three), failure to intervene (Count Four), or Conspiracy (Count Five). These are the only claims asserted against the individual Linn County Defendants. Accordingly, because Plaintiff has not stated an underlying constitutional, any corresponding municipal or official-capacity claim likewise fails and must be dismissed.

Linn County Defendants alternatively argue that Plaintiff has not pleaded the existence of a policy or custom that led to the alleged constitutional violations in this case. Doc. 56 at 17. Plaintiff relies on *Taylor v. RED Development, LLC*, to argue that he has met this standard. Doc. 63 at 16. *Taylor* discussed the pleading standard for municipal liability claims in light of *Iqbal*. It cited with approval a "balance, requiring more than boilerplate allegations but not demanding specific facts that prove the existence of a policy." *Taylor v. RED Dev., LLC*, 2011 WL 3880881, at *3 (D. Kan. 2011) (internal quotation and citation omitted). *Taylor* concluded that the plaintiffs in that case met that standard because they had "identified a specific practice to which the officers' conduct allegedly conformed—namely, the purposeful targeting and detention of African-American shoppers despite the absence of probable cause to believe that such shoppers engaged in shoplifting activities." *Id.* at *4. Plaintiff argues that he has plausibly alleged that Linn County Defendants "conformed to the practices of failing to disclose exculpatory evidence, fabricating evidence, and pursuing wrongful convictions," Doc. 63 at 16 (citing Doc. 47 at 37), and that this is sufficient under *Taylor*.[21]

---

[21]   In *Taylor*, the court explained how a plaintiff without access to internal policies or procedures of a municipal defendant might nevertheless adequately plead a policy or custom: "Allegations that provide such notice could include, but are not limited to, past incidents of misconduct to others, multiple harms that occurred to the plaintiff himself, misconduct that occurred in the open, the involvement of multiple officials in the misconduct, or the

The Court concludes that Plaintiff has not met the requisite standard. The only allegation in the amended complaint about a policy or custom of Linn County is statement that the Linn County Sheriff's Department "regularly" engaged in the type of conduct "alleged herein." Doc. 47 at ¶ 148 (listing failure to disclose exculpatory evidence, fabrication of evidence, and wrongful convictions obtained through flawed investigations). But there are no <u>facts</u> alleged that would support the allegation that Linn County had any such policy, custom, or widespread practice—just Plaintiff's conclusory statement that it did. Conclusory allegations of a policy or custom are not sufficient to sustain a municipal liability claim. *See Pyle*, 874 F.3d at 1266 (holding that "an allegation [that] it was the policy of Cottonwood Heights to query employees' prescription drug records without a warrant" was "the type of formulaic recitation of the elements of a cause of action that is insufficient to meet the *Twombly* pleading standard" (internal quotation and citation omitted)); *Carbajal*, 808 F. App'x at 638 (finding allegations that a municipality had a "policy, custom, and/or practice of suppressing and/or destroying material evidence to gain an unfair advantage" and a "policy, custom and/or practice of covering up official misconduct to avoid civil liability, which[ ] has fostered a culture of misconduct and an environment where such illegal and unconstitutional behavior is approved and condoned" was too conclusory to sustain a *Monell* claim); *Calvo-Pino*, 514 F. Supp. 3d at 1327 (finding that general allegations about policies or customs "relating to prolonged detentions during traffic stops, unlawfully searching vehicles after obtaining coerced consent, and making unlawful arrests without probable cause during traffic stops" were conclusory and did not state a claim for municipal liability). The allegations that these other decisions have found conclusory are like those asserted by Plaintiff in the amended

---

specific topic of the challenged policy or training inadequacy." *Taylor*, 2011 WL 3880881, at *3 (internal quotation and citation omitted). No similar factual allegations are made here. The only allegations here involve the singular interaction Plaintiff had with law enforcement. "Ordinarily, a single incident of unconstitutional behavior is insufficient to impose municipal liability." *Calvo-Pino v. Weidl*, 514 F. Supp. 3d 1321, 1327 (D. Kan. 2021).

complaint. Accordingly, this is an alternative basis to dismiss Plaintiff's claim for municipal liability as to Linn County.

Plaintiff also alleges that Friend and Johnson are liable in their official capacities because the "constitutional violations were committed with the knowledge or approval of persons with final policymaking authority," and that Friend and Johnson "ratified and authorized the fabrication of evidence and the withholding of exculpatory information." Doc. 47 at ¶¶ 150-152. But as discussed above, this is just a conclusion not bolstered by any facts. There are no facts alleged that Friend and Johnson had any involvement in this case such that it could transform the conclusory allegation that they "ratified and authorized" any action into a plausible claim for relief. *See Bowling v. United States*, 2009 WL 723226, at *13 (D. Kan. 2009).

Accordingly, the Court dismisses Plaintiff's claim for municipal liability (Count Ten) because he has not stated any underlying constitutional violations by the individual Linn County Defendants, and because he has not pleaded any policy or custom.

### E.    Absolute Immunity – Counts Three, Four, and Five Against Rieg and Southall

AG Defendants Rieg and Southall assert absolute immunity for the claims asserted against them individually (Counts Three, Four, and Five) because the claims arise out of their activities as prosecutors in Plaintiff's criminal trial. Doc. 54 at 6-7. Plaintiff argues absolute prosecutorial immunity does not apply here because the allegations against Rieg and Southall "implicate nonjudicial functions" and Rieg's and Southall's direction to the KHP to do a full accident reconstruction was an "investigative act." Doc. 62 at 3-4.

Absolute prosecutorial immunity bars any claim for damages under § 1983. *Chilcoat v. San Juan Cnty.*, 41 F.4th 1196, 1208 (10th Cir. 2022). "The Supreme Court has emphasized that functions 'undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for

trial, and which occur in the course of his role as an advocate for the State, are entitled to the protections of absolute immunity.'" *McRoberts v. Rosas*, 2022 WL 4482481, at *7 (D. Kan. 2022) (quoting *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993)).

"[A]bsolute prosecutorial immunity is intended to protect the judicial process, not the prosecutor." *Chilcoat*, 41 F.4th at 1208. Courts employ a "functional approach" to determine whether a prosecutor's actions are shielded by immunity, looking "to the nature of the function performed, not the identity of the actor who performed it." *Glaser v. City & Cnty. of Denver, Colo.*, 557 F. App'x 689, 704-05 (10th Cir. 2014) (internal quotation and citation omitted). Actions "intimately" associated with the judicial process are protected. *Id.* Thus, "[p]rosecutors are entitled to absolute immunity for their decisions to prosecute, their investigatory or evidence-gathering actions, their evaluation of evidence, their determination of whether probable cause exists, and their determination of what information to show the court." *Nielander v. Bd. of Cnty. Comm'rs of Cnty. of Republic, Kan.*, 582 F.3d 1155, 1164 (10th Cir. 2009).

By contrast, immunity does not extend to a prosecutor who is acting as a witness. *Id.* Nor does it apply "when a prosecutor conducts investigative work normally performed by the police." *Glaser*, 557 F. App'x at 705; *see also Carbajal*, 808 F. App'x at 631 (stating that a "prosecutor's administrative duties and those investigatory functions that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings are not entitled to absolute immunity" (internal quotation and citation omitted)).

The Court finds Rieg and Southall are entitled to absolute prosecutorial immunity based on the allegations against them.[22] Plaintiff was charged with second-degree murder by a county

---

[22] The Court will assume without deciding that the sparse allegations against Rieg and Southall could be read to allege plausible claims against these two defendants. However, at most, the allegations are just that Rieg and Southall instructed the KHP to perform a more fulsome analysis of the evidence and then dismissed the murder

prosecutor not named in this case. Doc. 47 at ¶¶ 47, 60. A few months later, the KHP provided an initial accident reconstruction report that reflected the intentional-crash theory. *Id.* ¶¶ 66-67. Plaintiff's defense team apparently then hired their own expert, who concluded the accident was not intentional. *Id.* ¶ 68. This caused the KHP to reevaluate their report and bring their concerns about it to the prosecutors (Rieg and Southall). *Id.* ¶¶ 69-70. Rieg and Southall instructed the KHP to do a full reconstruction of the accident. *Id.* ¶ 71. After the subsequent report was complete, and it did not support the intentional-crash theory, Rieg and Southall dismissed the murder charge against Plaintiff. *Id.* ¶ 78.

These allegations put Rieg's and Southall's conduct squarely within the judicial process and the role of the prosecutor. *Nielander*, 582 F.3d at 1164 (stating that prosecutors are entitled to immunity for "their evaluation of evidence"). Plaintiff disagrees and argues Rieg and Southall were acting in an investigatory capacity because ordering a reinvestigation into the crash was "the creation of evidence." Doc. 62 at 5. But that is not the type of investigative acts that typically fall outside the bounds of prosecutorial immunity. *See, e.g.*, *Buckley*, 509 U.S. at 274 ("Thus, if a prosecutor plans and executes a raid on a suspected weapons cache, he has no greater claim to complete immunity than activities of police officers allegedly acting under his direction." (internal quotation and citation omitted)). Rather, Rieg and Southall are alleged to have responded to a challenge made to evidence in the case they were prosecuting. *See* Doc. 68 at 2 ("[T]he AG prosecutors did what they are supposed to do: they re-evaluated the strengths and weaknesses of their case, and they adjusted accordingly."). This is a fine distinction, but an important one.

---

charge against Plaintiff when the evidence no longer supported it. No actual malfeasance is alleged, and the inferences Plaintiff draws to suggest as much stretch the bounds of reasonableness.

Absolute prosecutorial immunity applies to "the professional evaluation of the evidence assembled by the police and appropriate preparation for its presentation at trial or before a grand jury after a decision to seek an indictment has been made." *Buckley*, 509 U.S. at 273. This is what Plaintiff has alleged happened here. His defense expert challenged the initial report by the KHP, and upon hearing as much, Rieg and Southall directed the KHP to reanalyze the crash. Based on the subsequent amended report, Rieg and Southall opted to dismiss the charges against Plaintiff. It is difficult to discern how these actions, done within the context of the prosecution of Plaintiff's criminal case, could be said to fall outside the judicial process. Likewise, it seems clear Rieg and Southall were acting in their capacity as advocates for the state by reconsidering the validity of the evidence in the criminal case. *See McRoberts*, 2022 WL 4482481, at *7.[23]

The Court therefore dismisses Counts Three, Four, and Five against AG Defendants Rieg and Southall because they are entitled to absolute prosecutorial immunity.[24]

## IV.   CONCLUSION

The Court summarizes its rulings as follows:

- KHP Defendants Tarpley and Presley are dismissed because there are no factual allegations against them.[25]

---

[23]  It is worth noting that the conduct of Rieg and Southall that Plaintiff complains about was the instruction to the KHP to reevaluate the intentional-crash theory, which led to the dismissal of the murder charge. Had Rieg and Southall <u>not</u> directed the KHP to do a second reconstruction report and proceeded with the murder prosecution based on the intentional-crash theory in the original report, flawed as it perhaps was, Plaintiff would not be able to argue they engaged in investigatory activities in an attempt to deny them immunity. Nor does Plaintiff explain why Rieg and Southall should have just accepted his defense expert's view of the evidence and dismissed the case without additional investigation.

[24]  Plaintiff also argues that Rieg and Southall are not entitled to prosecutorial immunity on the failure-to-intervene or conspiracy claims because failing to stop the "reinvestigation" and continuing the conspiracy falls outside the judicial function. Doc. 62 at 5-6. The Court does not entirely follow these arguments. But it would seem that Plaintiff is just reasserting the same argument rejected above, namely that their actions were not the type typically afforded immunity.

[25]  The Clerk's Office should also correct the docket to reflect that Defendants Hart, Moore, Carney, Miranda Edwards, John Edwards, and Banks are no longer Defendants.

- Counts One, Three, Four, and Five are dismissed as to Friend (individual capacity), Johnson (individual capacity), Parscale, Ogden, Beabout, Burk, Gill, Gillespie, Smith, Stokes, Turner, Bachert, Drennan, Raines, and Voigts for failure to state a claim under Rule 12(b)(6).

- Counts One, Three, Four, and Five are alternatively dismissed as to Friend (individual capacity), Johnson (individual capacity), Parscale, Ogden, Beabout, Burk, Gill, Gillespie, Smith, Stokes, Turner, Bachert, Drennan, Raines, and Voigts because they are entitled to qualified immunity on these counts.

- Count Ten is dismissed as to Linn County, Friend (official capacity), and Johnson (official capacity) for failure to state a claim under Rule 12(b)(6).

- Counts Three, Four, and Five are dismissed as to Rieg and Southall because they are entitled to absolute prosecutorial immunity.

Based on these rulings, all Linn County Defendants are dismissed from this case. All KHP Defendants are dismissed from this case. AG Defendants Rieg and Southall are dismissed from this case. KBI Defendant Smith is dismissed from this case. These dismissals are with prejudice. *See Rollins v. Wackenhut Servs., Inc.* 703 F.3d 122, 132-33 (D.C. Cir. 2012) (Kavanaugh, J., concurring) (noting that a Rule 12(b)(6) dismissals are generally an adjudication on the merits and are typically with prejudice).[26]

The remaining claims and Defendants are:

- Count Two against KBI Defendants Beabout, Stokes, and Gillespie;

- Count Six against KBI Defendants Stokes, Beabout, Gill, and Burk;

- Count Seven against KBI Defendant Burk;

- Count Eight against KBI Defendants Burk, Gill, and Beabout; and

---

[26] Plaintiff amended the complaint once after an initial round of motions to dismiss were briefed. Those motions raised similar arguments as those at issue here. Given Plaintiff's failure to cure with that amendment, the Court finds dismissal with prejudice is appropriate. *See Rollins*, 703 F.3d at 132-33 (noting that any potential unfairness in dismissing cases with prejudice under Rule 12(b)(6) is ameliorated by the fact that a plaintiff has the right to amend as a matter of course after an initial motion to dismiss is filed).

- Count Nine against KBI Defendants Beabout and Turner.[27]

THE COURT THEREFORE ORDERS that the Linn County Defendants' Motion to Dismiss (Doc. 55) is GRANTED. The Linn County Defendants are all dismissed from this case as stated above.

THE COURT FURTHER ORDERS that the KHP Defendants' Motion to Dismiss (Doc. 57) is GRANTED. The KHP Defendants are all dismissed from this case as stated above.

THE COURT FURTHER ORDERS that the AG/KBI Defendants' Motion to Dismiss (Doc. 53) is GRANTED to the extent it seeks dismissal of Counts One, Three, Four, and Five. Smith, Rieg, and Southall are dismissed from this case. Certain other claims against various KBI Defendants remain pending as stated above.

IT IS SO ORDERED.

Dated: June 20, 2024             /s/ *Holly L. Teeter*
                                 HOLLY L. TEETER
                                 UNITED STATES DISTRICT JUDGE

---

[27] As noted above, the Court finds the KBI Defendants have not adequately raised any arguments in favor of dismissal of Counts Two and Six through Nine, including qualified immunity. Nothing in this order precludes those individuals from asserting any such argument at an appropriate time and in accordance with the Federal Rules of Civil Procedure.